1

1                 UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF KENTUCKY
2                 CENTRAL DIVISION AT LEXINGTON

3
UNITED STATES OF AMERICA,        :   Docket No. 20-CR-13
4                                 :
                     Plaintiff,   :   Covington, Kentucky
5                                 :   Monday, September 28, 2020
          versus                  :   4:00 p.m.
6                                 :
GUADALUPE RAMOS,                  :
7                                 :
                     Defendant.   :
8
                          - - -
9
                  TRANSCRIPT OF SENTENCING
10                 BEFORE DANNY C. REEVES
         UNITED STATES CHIEF DISTRICT COURT JUDGE
11
                          - - -
12
APPEARANCES:
13
For the United States:      CYNTHIA T. RIEKER, ESQ.
14                          U.S. Attorney's Office
                            260 West Vine Street
15                          Suite 300
                            Lexington, KY 40507-1612
16

17 For the Defendant:        CHARLES P. GORE, ESQ.
                            155 E. Main Street
18                          Suite 101
                            Lexington, KY 40507
19

20 Court Reporter:           JOAN LAMPKE AVERDICK, RDR, CRR
                            Official Court Reporter
21                          35 W. Fifth Street
                            Covington, KY 41011
22

23

24      Proceedings recorded by mechanical stenography,
   transcribed via computer-aided transcription.
25

1          (Proceedings commenced at 3:40 p.m.)

2          THE COURT:  Thank you.  Madam Clerk, would you call

3     the matter scheduled for 4:00, please.

4          DEPUTY CLERK:  Lexington Criminal 20-13, United

5     States versus Guadalupe Ramos.

6          THE COURT:  Thank you.  Would counsel state their

7     appearances, please.

8          MS. RIEKER:  Good afternoon, Your Honor.  Cindy

9     Rieker on behalf of the United States.

10         THE COURT:  And Mr. Gore.

11         MR. GORE:  Good afternoon, Your Honor.  Charlie Gore

12    on behalf of defendant, which is Guadalupe Ramos, seated to my

13    right.

14         THE COURT:  Thank you.

15      This matter is scheduled for a sentencing hearing this

16    afternoon.  Before we proceed, let me confirm that Mr. Ramos

17    has had the opportunity to review his presentence report and

18    also to discuss the report with his attorney to his

19    satisfaction.

20      Is that correct?

21         THE DEFENDANT:  Yes, sir.

22         THE COURT:  Mr. Ramos, your presentence report will

23    be filed in the record under seal.  It is available if you

24    should need it for any reason, but it's not available for the

25    public to review, pursuant to Rule 32 of the Federal Rules of

1    Criminal Procedure.

2        There's one objection that does affect the guideline

3    calculation.  The defendant, in objection number 2, objects to

4    the inclusion of the two-level enhancement set forth in

5    paragraph 23 under Section 2D1.1(b)(1) for a firearm being

6    possessed.  He maintains that the firearm was not involved in

7    the drug activities since he did not possess it at any time

8    during the drug activities and states there's no evidence he

9    possessed the firearm while engaged in drug trafficking.

10       The United States would have the burden of going forward

11   on this issue as much as this would be an enhancement to the

12   guideline range of two levels.

13       Ms. Rieker.

14        MS. RIEKER:  Thank you, Your Honor.  I have filed a

15   response, and I'll proffer to the Court because I don't think

16   we're really in disagreement about the facts, but whether or

17   not the application of that enhancement applies in this

18   situation.

19       As I have put forth in my response, kind of the

20   background of this investigation, which the Court, I know, is

21   aware of based on the PSR in this case, the day that the

22   agents were going to execute the search warrants, they did

23   conduct surveillance of Mr. Ramos.  They observed him leave

24   his Russell Cave residence, and he traveled to a laundromat

25   which was close to the Bright Avenue residence.

1       Prior to this, of course the agents had been observing

2   Mr. Ramos.  They were aware that he had this Bright Avenue

3   residence that appeared to be a stash house.  And he was also

4   coming and going from his Russell Cave Road address during

5   some controlled purchases that they had made from him.

6       And so based upon that, they had done some surveillance.

7   They had some pole cameras that were established at Russell

8   Cave as well as Bright Avenue.  And the search warrant that

9   was executed was based upon their observations of the Bright

10  Avenue residence and where they had seen him come.

11      They had a tracker on his car.  He had gone to Atlanta,

12  the Atlanta area, for a period of time, and had just come back

13  from that area when he then is observed going into this Bright

14  Avenue residence.

15      He's seen coming out with items.  He places those in the

16  trash.  They make the trash pull.  And subsequent to that, the

17  trash pull, they located evidence related to drug trafficking,

18  and that's the reason for the search warrant.

19      When they stopped him after he left the laundromat, he

20  did have firearms at that time in his vehicle.  There was one

21  pistol.  There was a Ruger .9 millimeter that was located in

22  the driver's side door.  There was a Century pistol which was

23  located in the trunk next to a full magazine.

24      There were some drugs that were located in the vehicle.

25  They weren't of the type that he has been charged with.  They

1    were more of a possession amount.  So I didn't really talk

2    about that because it wasn't really charged and wasn't

3    documented very well either.

4         THE COURT:  Yes.  The presentence report indicates

5    that in addition to drugs at the Bright Avenue address that

6    were found on a subsequent search, there was also .9

7    millimeter ammunition.  Is that in dispute?

8         THE WITNESS:  No, Your Honor, I don't think it is.

9         THE COURT:  So we have .9 millimeter ammunition which

10   is the same and we have a .9 millimeter handgun in the

11   vehicle, inside the vehicle, near the driver's side, correct?

12        THE WITNESS:  Yes, that is correct, Your Honor.  That

13   is correct.

14        In addition to that, after they execute the search

15   warrant at Bright Avenue, they then went to Russell Cave.  And

16   when they went to Russell Cave and they searched there, they

17   again found firearms.  They found a semi-automatic pistol, a

18   loaded .38 caliber revolver in the bedroom dresser drawer that

19   was identified as his bedroom.

20        They also located in the bottom dresser drawer was two

21   digital scales.  There was assorted ammunition.  There were

22   pharmaceutical pills.

23        Also in that drawer, agents located a wire transfer

24   receipt documenting an $890 money transfer to Mexico in

25   December of 2019.

1    Additional evidence of drug trafficking was located in

2    the residence, including body armor, two Ziploc brand heat

3    sealers, one in a bedroom closet and one in a bedroom dresser.

4    There was a GStar brand money counting machine, which was

5    located in a vestibule between the garage and the house.

6        There was a -- in addition to those items, which were all

7    indicative of drug trafficking, there were five ounces of a

8    packaged methamphetamine that was located in the garage up on

9    a -- by a joist in the garage.

10        THE COURT:  This is later tested and determined to be

11   crystal methamphetamine?

12        MS. RIEKER:  That is correct, Your Honor.

13        THE COURT:  And you've got the test results on that?

14        MS. RIEKER:  We do, Your Honor.  We do.  It's

15   included in the drug quantity in the PSR.

16        THE COURT:  I have the second report in the case.  In

17   the original presentence report, the second amended where they

18   attached the report.

19        MS. RIEKER:  That's right.  All of the -- all of the

20   methamphetamine that was located at Bright Avenue and then

21   that was subsequently located at Russell Cave was believed to

22   be crystal methamphetamine.  That has all been submitted to

23   the lab.

24        This drug quantity that was included in the addendum is,

25   in fact, all tested and does include the testing which

1    indicated that it's actual methamphetamine, which is, thus,

2    the drug quantity number.

3        So I guess my point on all of this, Your Honor, is that

4    clearly this evidence establishes that Ramos was in possession

5    of firearms.  The question then is that there's a presumption

6    that has arisen and whether or not that weapon was connected

7    to the offense.

8        THE COURT:  Well, we only have to have one weapon

9    connected to the offense.

10       What was the nature -- what was the type of weapon found

11   in the closet of the Russell Cave address?

12       MS. RIEKER:  That was an American Tactical Import ATI

13   multi-caliber firearm, the 5.56 millimeter .223 caliber

14   firearm.  And that was in the bedroom closet, the same bedroom

15   where the body armor was found as well as the digital scales

16   and other items that I have listed.

17       THE COURT:  The tracker on the car, is this the car

18   that the defendant had driven to Georgia and then returned

19   from Georgia?

20       MS. RIEKER:  Yes, Your Honor.

21       THE COURT:  Was there ever any indication to

22   Surveillance that he placed handguns in the car after he

23   returned from Georgia?

24       MS. RIEKER:  No, Your Honor.

25       THE COURT:  And so when he was stopped and arrested,

8

1    at least two handguns were found in the car?

2            MS. RIEKER:  Um-hmm.

3            THE COURT:  Ammunition that could have fit into one

4    of the handguns was in the Bright Avenue address.

5        Bright Avenue, is that located off Georgetown Street

6    between Georgetown and Williamstown?

7            MS. RIEKER:  I believe that's correct, Your Honor.

8            THE COURT:  It may not be Georgetown.  I'm thinking

9    the other direction.

10           MS. RIEKER:  I believe it is off Georgetown.

11           THE COURT:  Georgetown?

12           MS. RIEKER:  Yes.

13           THE COURT:  Toward the Lexmark area if you're coming

14   from downtown?

15           MS. RIEKER:  I believe that's correct, yes.

16           THE COURT:  All right.

17           MS. RIEKER:  So based upon all of that, Your Honor, I

18   believe that the defense has not been able to rebut the

19   presumption of all of this evidence.  When you look at

20   2D1.1(b)(1) and you look at the types of things that the Court

21   is to consider as to whether or not the application applies,

22   clearly all of these are firearms that are the type that would

23   be involved in drug trafficking.  They were clearly accessible

24   to the defendant.

25       The presence of the -- there was presence of ammunition,

1    as the Court has pointed out.

2         The proximity of the weapon to the illicit drugs is

3    certainly there, certainly in the Russell Cave Road address,

4    because the firearms are found in close proximity to the

5    drugs.

6         And so based on that, Your Honor.  And then there is, I

7    guess, one more enumerated factor, which is was he actually

8    involved, engaged, in drug trafficking rather than

9    manufacturing.  Clearly he was in this particular case.  It's

10   a significant quantity of drugs.

11        I think everything that we see in this case is indicative

12   of drug trafficking.  There's no question that firearms are

13   used commonly by drug traffickers to protect what they have,

14   their assets and themselves.  And I think based upon that, the

15   enhancement is correctly applied.  In this case, we'd ask the

16   Court overrule the objection.

17        THE COURT:  Thank you.  One other question.  The

18   drugs involved here, they're not relevant conduct.  They're

19   actually, they relate to specific counts in the case, correct?

20        MS. RIEKER:  That's correct.

21        THE COURT:  Because there's a section of the

22   guidelines about if you frivolously contest relevant conduct,

23   then it could result in loss of acceptance of responsibility.

24   But we're not dealing with relevant conduct with this issue?

25        MS. RIEKER:  Not with this issue, Your Honor.

1          THE COURT:  All right.  Thank you.

2      Mr. Gore.

3          MR. GORE:  Thank you, Judge.  In my motion, I want to

4      first thank the Court.  You granted us a continuance, and I

5      appreciate that very much.

6          Addressing this particular objection, the government does

7      have the burden to establish the connection.  They've got to

8      tie --

9          THE COURT:  Well, not connection.  Possession.  They

10     have the burden of establishing the defendant possessed the

11     weapon.

12          MR. GORE:  Right, but in relation to the offense.

13          THE COURT:  No.  If a dangerous weapon including a

14     firearm was possessed, increase by two levels.

15          MR. GORE:  But the gun has to be connected with the

16     offense.

17          THE COURT:  The United States has the burden of

18     establishing that if the weapon was present, unless it is

19     clearly improbable that the weapon was connected with the

20     offense.  So the burden shifts.  Once the government

21     establishes possession, it becomes your burden to establish

22     that it's clearly improbable that it's connected with the

23     offense.

24          MR. GORE:  Okay.  And in that light, this is a

25     situation where they had pole cameras, they had trackers on

his vehicle.  They had a lot of surveillance.  They had some
hand-to-hand situations.  And never was there any reference in
terms of the surveillance to the defendant possessing weapons.
Never was there any information that I'm aware of from anybody
involved with the purchase of the drugs that the defendant
ever possessed --

THE COURT:  Right.  So you're saying he didn't
possess it in connection with another drug trafficking
offense, which would be a five-year mandatory minimum if that
had been charged, which it wasn't.  This is a two-level
enhancement of the guidelines for possessing a firearm.

MR. GORE:  Still I think I'm just taking a position
that the weapons weren't connected -- weren't involved with
this transaction.  The guns weren't associated with the drug
activities.  And I think that gives rise to the fact that it's
improbable that those guns were possessed in relation to the
charge.

THE COURT:  What would a person possess these type of
weapons for if there was not drug trafficking activities?
Looking at the drugs that were found -- just look at the
Russell Cave address and you don't look at the Bright Avenue
address.

We have drugs in a house.  We have drug paraphernalia in
the house, the storage and packaging.  We have body armor.  We
have an assault-type weapon in the closet.  We have handguns

1   in the bedroom dresser where some indicia of drug activity was

2   found.  We have substantial amount of crystal methamphetamine

3   hidden in the rafters in the basement.

4       So why would a person possess -- let's talk about the

5   weapons in the closet first.  Why in the world would a person

6   possess that type of a weapon?  Because we can look at the

7   nature of the weapon, right?  Was it loaded, the location of

8   the weapon.

9               MR. GORE:  I think those are factors, Judge.

10              THE COURT:  All right.

11              MR. GORE:  He may be a sportsman.  He might target

12   hunt.  He's never been in trouble.  He's not a convicted

13   felon.  So maybe he just likes to target shoot.

14              THE COURT:  Well, the issue is you have to establish

15   it's clearly improbable.  It's a higher burden than a

16   preponderance standard.  You have to establish that it's

17   clearly improbable that the weapon was connected with the

18   offense.  So each one of these weapons you have to establish

19   is clearly improbable if they were connected with the drug

20   trafficking offenses in this particular matter.

21              MR. GORE:  Well, I guess I made the objection.

22              THE COURT:  Well, do you not want me to ask you about

23   it?

24              MR. GORE:  No, no.  That's fine, Judge.  I understand

25   what you're saying.  He's got a -- we do have a number of

guns.  That complicates the explanation.  They were located in several different locations.  That complicates the explanation.

I can't refute the fact that there was two guns in a drawer and a gun in a closet.  All I can say is that in the building where the guns were, they found some marijuana and I think maybe a few pills.  He admitted he was a user of marijuana.

He had a separate house for -- I said Brian Avenue, but I apologize.  It was Bright Avenue.  He had a separate house because that was a stash house that was maintained for that purpose so he got a two-level enhancement for that.

Just in the absence of them showing that the guns were possessed by him when he was doing any transactions with anybody, either for himself or selling them himself, I think that's in his favor.

I understand what the Court's saying.

THE COURT:  I'm just asking questions.  There are certain factors I'm supposed to look at in the cases that you've cited, and so I'm asking you questions about those factors, including the nature of the weapon -- weapons because there were several here we're dealing with.

MR. GORE:  And I know I've got to consider the nature of the weapons isn't necessarily in our favor.

THE COURT:  All right.  All right.  Thank you.

1    I'll overrule the objection to paragraph 26.  I do find

2    that there is abundant evidence not only that the weapon was

3    possessed, but it was possessed in connection with drug

4    trafficking activities.  And the Court does not have to go

5    that far, but I do find they were possessed in connection with

6    drug trafficking activities, specifically to protect the

7    defendant's drug stash.  And this was held not only at the

8    stash house and also to protect himself, but it was also held

9    at the Russell Cave Road address.

10   When we look at the drug trafficking activities and the

11   indicia of drug trafficking activities, they're present at

12   both locations.  And there's an indication that the defendant

13   had actually possessed at least one .9 millimeter handgun.

14   There was .9 millimeter ammunition at the Bright Avenue

15   address in addition to all these drugs that are listed.  But

16   there was also evidence listing drug trafficking activities

17   again at the Russell Cave address, including two handguns in

18   the dresser, two digital scales in the same room, ammunition

19   in a downstairs bedroom closet.

20   We have the American Tactical Imports, the multi-caliber

21   firearm that was in that location.  Those are the type of

22   weapons that are often found in this type of drug trafficking

23   activities.  And the handguns are as well.  They're often

24   found in connection with drug trafficking activities.

25   We have information linking the defendant with wire

1    transfers from Mexico.  This, along with the marijuana, would

2    be sufficient to connect him to drug trafficking activities.

3    The count involving marijuana is a possession.  It's not

4    trafficking.  But there is evidence of other trafficking

5    activities here charged in the case.

6         There are also pharmaceutical pills, as well as a

7    significant amount of methamphetamine, which it turns out is

8    crystal methamphetamine, located at that residence.

9         And one would be hard-pressed to conclude by any burden

10   that these firearms were not connected with drug trafficking

11   activities.  They clearly were possessed by the defendant, and

12   the defendant has not established what's required by the

13   guidelines.  Once the government proves that they were

14   possessed, he's not established that it's clearly improbable

15   they were connected with the offense.  Just the opposite would

16   seem to be the case, and the Court so finds.

17        I haven't even mentioned the other items that were found

18   in his house, including body armor, ammunition, heat sealers.

19   They're often used not only for drugs, but also for currency,

20   to transfer it.  As a result, he seeks the one pistol in

21   another encounter.

22        The Court finds that the government has met its burden

23   much beyond a preponderance of the evidence and the defendant

24   has not met his corresponding burden.  It's his to establish.

25   So the objection's overruled.

1          MR. GORE:  Judge, may I address another issue?

2          THE COURT:  Yes.

3          MR. GORE:  And I apologize.  In the course of having

4     a phone conversation with my client, he expressed to me that

5     he wanted me to ask the Court to impose the safety valve in

6     this situation.

7          He and I previously discussed the safety valve.  I think

8     there is a couple of problems with acquiring the safety valve.

9     But he asked me to ask the Court to do that.  My paralegal

10    isn't in on Fridays so I didn't have time to prepare anything.

11         He also wanted me to object to the use of the new drug

12    test that showed the purity on a large amount of the drugs.

13    He wanted me to object to that.  That resulted in a

14    essentially bump from level 36 up to a level 40.

15         And the basis for that -- the only argument I can make on

16    that would be the report, as he discussed before, was actually

17    prepared in March -- or the test was done on March 16th.  It

18    was approved by a supervisor March 17th, and we received it

19    just a few days before it originally was sent to me.

20         I certainly do not mean to impugn that Ms. Rieker had

21    that report.  I'm totally confident she didn't have the

22    report.  But my client wants me to object to the use of that

23    report on the grounds it was just exposed to us shortly before

24    sentencing.

25         THE COURT:  Well, before the last hearing we had.

1       MR. GORE:  And I understand that.  And I'm going to

2   acknowledge that Ms. Rieker and I had a number of discussions

3   about the importance of that test and that it could still come

4   back and affect us.  And she was exactly right in what she

5   said the last time; we did have those discussions.

6       I'm just -- my client is just wanting me to object to the

7   use of that report because of the delay in providing it to us.

8       THE COURT:  Let me ask you a couple of questions

9   about your objections, and then I'll hear from the United

10  States.

11      Under the -- to apply the safety valve, of course, the

12  statutory safety valve is not always -- the statutory safety

13  valve has been modified recently.  Either under the statutory

14  safety valve or the guideline safety valve, which is what

15  you're discussing here, there are five factors that have to be

16  established.

17      Now, with regard to two of those factors, one is that you

18  cannot possess a firearm, and another is that no later than

19  the time of the sentencing hearing, the defendant has

20  truthfully provided to the government all information into

21  evidence the defendant has concerning the offense or offenses

22  that were part of the same course of conduct or of a common

23  scheme or plan.  The fact that the defendant has no relevant

24  or useful other information to provide or that the

25  government's already aware of the information shall not

1   preclude a determination by the Court that the defendant has

2   complied with this requirement.

3       So I would ask you if, after the plea was entered by the

4   defendant, whether he has proffered with the government or if

5   he's attempted to provide the United States with all the

6   information that's required under that section of the safety

7   valve?

8           MR. GORE:  We have not.

9           THE COURT:  He hasn't raised the issue until today

10  that he wants the safety valve, but he hasn't attempted to

11  proffer any information to the government that would include

12  relevant conduct such as contacts in Atlanta or his sales in

13  Lexington or any information at all related to specifically

14  the conduct.

15          MR. GORE:  That's correct, Your Honor.

16          THE COURT:  All right.  So am I to ignore that

17  particular section of the safety valve?

18          MR. GORE:  I had these discussions with my client.

19  He wanted me to make the objection.

20      He was -- obviously, he was definitely jolted when that

21  test result came back and we went -- you know, he ended up

22  looking at seven years more than he was hoping to get, and the

23  force of that.  He couldn't function in that situation.  That

24  came as a shock, and he just -- that's it.

25          THE COURT:  You entered into a nonbinding plea

agreement with the United States in the case.  The government

produced evidence after this testing was performed, this

methamphetamine testing, that had the effect of increasing the

base offense level in the case based upon drug quantity.  And

this was all discussed at the last hearing we had.  I believe

it was in August?

MR. GORE:  That's correct, Judge.

THE COURT:  And since that time, has there been any

attempt to have this methamphetamine retested?

MR. GORE:  No, Your Honor.

THE COURT:  Has there been any effort to seek to

withdraw the guilty plea in the case?

MR. GORE:  No.  And for the record, I would like to

advise the Court that he and I had that discussion, and I

explained the process to him, and he told me not to file or

set aside his guilty plea so I have not filed such motion.  We

did discuss it.

THE COURT:  All right.  So you're acting in

accordance with his instructions.

MR. GORE:  Correct.

THE COURT:  So we have test results that are not

refuted, and you don't seek to refute it, that establish the

drug quantity.

Of course, the Sixth Circuit has been very clear that the

first thing the Court has to do in conducting the sentencing

1   hearing is accurately calculate the guideline range.  To do

2   that, I have to know what the drugs are that are involved.

3   You can't say that it's marijuana when it's actual

4   methamphetamine.

5        So we've got actual test results that would indicate what

6   the substance was.  You've got a nonbinding plea agreement

7   that the parties clearly you've established and they

8   acknowledged, at the time that the plea was entered, that this

9   was not binding on the Court.  And you could not make an

10  accurate estimate of calculation with certainty as to what the

11  guideline range might be because we didn't have all the test

12  results at the time that he entered a guilty of plea, but that

13  he wanted to enter a plea.

14       And he's not attempted to proffer with the government so

15  he's acknowledged that he can't meet one of the prongs of the

16  safety valve.  And I've already made a finding that he had

17  possession of the firearm so he doesn't meet another prong of

18  the safety valve.

19            MR. GORE:  I understand, Judge.

20            THE COURT:  All right.  Ms. Rieker, what's the

21  position of the United States?

22            MR. GORE:  Judge, I will say -- I'm sorry.  I

23  apologize.

24       As soon as I got off the phone with my client and he told

25  me he wanted me to make those two objections, I called

1   Ms. Rieker and advised her, and I may even called Mr. Hammond

2   and advised him, just so nobody would be surprised.

3        THE COURT:  Well, you're making objections after the

4   deadline to make objections.  You've made those here today.

5        MR. GORE:  It is, and I acknowledge that that's the

6   deadline.

7        THE COURT:  What's the position of the United States

8   on these?  The first is, we talked about these drug tests

9   quite a bit at the last hearing.  You were seeking

10  information.  You received the information on this meth test.

11  You gave those to Mr. Gore.  And there has not been any effort

12  to withdraw the guilty plea based upon the defendant's claimed

13  surprise that they turned out to be actual methamphetamine.

14       MS. RIEKER:  Yes.  Do you want me to address that

15  issue first, Your Honor?

16       THE COURT:  Yes, ma'am.

17       MS. RIEKER:  You know, I went back after our last

18  proceeding and looked at the history of this case as to where

19  we are and where we were at various times in this case.

20       And the original trial was set for March the 24th, and we

21  were working toward either a resolution or trying that case on

22  March the 4th.

23       There was many conversations between myself and Mr. Gore

24  at that time about what this drug quantity and the

25  calculations may result in.  Because at the time, he's charged

1     with a mandatory minimum with the methamphetamine.  And

2     whether or not that would change that, it most likely would

3     not, given the amount that we already had.  But then we had

4     these pills that we believed to be fentanyl; and if the amount

5     had come back over 400 grams, which ultimately it does, that

6     would be an additional ten-year statutory mandatory minimum.

7     And so we went back and forth about, well, what do we think

8     the guidelines are.

9         And so after our court proceeding the last time, I went

10    back and I looked through some e-mails.  And on March the

11    1st -- or March the 2nd, I had an e-mail conversation with

12    Mr. Gore.  And I have this, and I'll be happy to introduce it

13    as Government's Exhibit Number 1.

14        And in that, I specifically outlined for him what I

15    believed the calculations are going to be.  Obviously, they're

16    not binding, but certainly I set forth what I believed the

17    guidelines were currently, without any final drug tests, in

18    which I calculated a base offense level 32, which I

19    communicated to him.

20        And then I went on to say that with the enhancements that

21    I believed would apply, that would be a total offense level of

22    36, which is, I think, where we landed on the original

23    presentence report in this case.

24        I then went on to explain to him that I believed that if

25    the drug quantity of methamphetamine came back as actual

1    methamphetamine, that that would change the converted drug

2    weight to 79,829.79 kilograms and would have a base offense

3    level of 36.  And then, of course, the enhancement would apply

4    on top of that, which is exactly where we've landed when we

5    get the testing.

6         So I think it's a little disingenuous to say we don't

7    know what this drug quantity is going to be, we didn't really

8    know, this is a huge surprise to us.  It can't be a huge

9    surprise.  We discussed it.

10        Now, what I will say about them not getting the drug

11   report is, we were attempting to resolve the case.  And, in

12   fact, I have another e-mail that Mr. Gore sent me that

13   basically said, if I can get him to plea, will you promise not

14   to supersede with a drug report, to which I respond, I can't

15   prevent him from pleading, but if I get these drug reports,

16   then I'm going to proceed with a superseding indictment.

17        He indicated that he was going to file a motion for

18   rearraignment.  I gave him the benefit of that and I didn't --

19   I personally did not follow up on the drug reports, but -- and

20   they weren't provided to me until I provided them to him.

21        I had received them maybe a few -- maybe a couple weeks

22   before that.  I thought I'd sent it, but I think I

23   inadvertently had not sent that to him.  But that would have

24   been after the guilty plea.

25        So all of this was in a benefit to the defendant.  He did

not receive an additional charge, a superseding indictment, for another mandatory minimum of ten years, which would be a total of potentially a 20-year mandatory minimum sentence.

So to come in here now and say we had no idea this was going to happen is just aggravating, quite frankly, because that's just not the fact.

And so based on that, Your Honor, we provided it when we provided it. I'm sorry. I was very specific in the plea agreement because I knew that those drug tests were out there. And so I put at least this quantity because that indicates that that's a minimum of what his base offense level is going to be. It's not the end-all, but at least it is this. I was very specific about that because of these issues that were out there with the drug reports.

I was not going to come into this court and not provide the Court with that final drug report. That would have been disingenuous on my part to not have done that.

So I think that's where we land on this, Your Honor.

And I have struggled with whether or not -- and I listened to Mr. Gore, and I'm not blaming him necessarily, but if this is the defendant who is just not admitting to his conduct, then I am struggling with, under 3E, whether or not I should even move for a third level of acceptance of responsibility. Because if it is his position that these are not his -- that this isn't right, then he is not accepting

1    full responsibility.

2        I think it's quite a different matter if Mr. Gore was

3    making a legal argument about it, but he's really not doing

4    that, in my opinion.  I think he's just saying it's because

5    the defendant is not accepting what he's done.

6        So I sat here struggling with whether or not I should

7    even move for the third level of acceptance of responsibility.

8    I gave him a benefit.

9        And so that's what I say about all of that, Your Honor.

10       THE COURT:  We still have the issue of the safety

11   valve.  The defendant wishes to receive the benefit of the

12   safety valve.  It has five prongs.  He would meet the criminal

13   history points of the safety valve.

14       MS. RIEKER:  He would.

15       THE COURT:  He's not been assessed a leadership role.

16   But I have made a finding that he did possess not one but many

17   weapons, several weapons.  That would be a disqualifying

18   factor.  But the other factor that we've been discussing is

19   whether he's provided the United States with all of the

20   information that he would have.

21       You know, this is really different than giving me

22   everything you know or, you know, giving the information that

23   you have concerning the offense.  Information, part of the

24   same course of conduct or common scheme or plan.  If he

25   doesn't have anything, he doesn't have to provide it,

1    obviously.  It's not a 5K issue, doesn't rise to that level,

2    but he still must provide information that would be relevant

3    here in this particular section.

4         As I understand it, there's been no attempt to have any

5    type of meeting, proffer session, anything of that nature.

6         MS. RIEKER:  There has been absolutely none, Your

7    Honor.  And, in fact, early on in this case when Mr. Gore and

8    I were speaking and discussing this case, he said, what can I

9    do?  You know, what are we going to do?  And I said, well, you

10   know, really his only hope at this point is for him to provide

11   information, and that he said, nope, that's not going to

12   happen.

13        And so that has never happened, Your Honor.  There's been

14   no reaching out to me.  There's been nothing about let me even

15   talk about where I got these drugs and that type of thing.

16        THE COURT:  That would be supported by the addendum

17   to the supplement to the plea agreement.  It's not filed in

18   the record, but you may wish to file it under seal.

19        MS. RIEKER:  Yes.  I think that would be a good idea,

20   Your Honor.

21        THE COURT:  All right.

22        MS. RIEKER:  And I would also like to introduce these

23   two e-mails just so the record -- we can file these under seal

24   as well, Your Honor.

25        THE COURT:  Yes, ma'am.

1        MS. RIEKER:  But these are the two communications

2    that I just referenced in my remarks.

3        THE COURT:  All right.  Provide those to the clerk.

4    Those will be marked as United States Exhibits 1 and 2 to this

5    proceeding.

6        All right.  Having heard from the parties on this issue,

7    I will overrule the defendant's request first for the Court to

8    apply the safety valve, the guideline safety valve, to this

9    particular matter to reduce the guideline range in the case,

10   the total offense level.

11       The defendant seeks a two-level reduction.  As indicated,

12   there are five factors that are to be met under the

13   guidelines, 5C1.1.  They outline some of those factors.

14   Excuse me, 5C1.2.  And the defendant has not established that

15   he did not possess a weapon.  I made a finding to the

16   contrary.

17       Likewise, he has not established -- he has not met

18   Section (a)(5), which provides that no later than the time of

19   the sentencing hearing, the defendant has truthfully provided

20   to the government all information and evidence the defendant

21   has concerning the offense or offenses that were part of the

22   same course of conduct or common scheme or plan.

23       I have had situations in the past where a defendant used

24   similar circumstances as they attempted to meet that prong on

25   the day of the sentencing hearing and it would be too late for

1    the government to do anything about the information.  That's

2    not a situation we have here.  The defendant has not made any

3    effort according to the parties' acknowledgement.  He has not

4    made any effort at all to meet that factor of the safety

5    valve; and, therefore, it clearly would not apply in this

6    particular case.

7         Likewise, I'll overrule the defendant's objections to the

8    Court considering his actual press result methamphetamine that

9    was seized from his residence.  The question is not whether

10   these test results are accurate.  That's not been challenged.

11   And likewise, the defendant has not established that the

12   government has acted improperly in any way in providing these

13   test results.

14        As the United States has indicated, the test results were

15   not received until after the defendant entered a plea, and

16   e-mails that have been offered by the United States do

17   establish that the actual methamphetamine test results do show

18   that would result in a higher guideline range in the case, and

19   that's what's happened here, maybe due in part to delays

20   related to COVID, but that's outside the United States'

21   control, obviously.

22        This Court does have an obligation to correctly calculate

23   the guideline range based upon accurate drug quantity and

24   accurate drug testing, which indicates the type of drug.  We

25   have that now, and the Court will not ignore those test

1     results that were either known or should have been known to

2     the defendant at the time that he entered his plea.  So I will

3     overrule the defendant's objections and discredit the

4     application of the statute guidelines.

5         Let's see if we have any other objections that either

6     party wishes to raise relating to the proceeding.

7              MS. RIEKER:  I have no objections, Your Honor.

8              THE COURT:  All right.  Mr. Gore, anything?

9              MR. GORE:  I do not, Your Honor.  And thank you for

10    allowing me to make those two objections.

11             THE COURT:  All right.

12        I'll adopt the findings that are contained in the

13    presentence report as well as the guideline calculations.  And

14    I will note again for the record the calculations regarding

15    the offense level, as well as prior calculations as set forth

16    in the second addendum to the presentence report, so we'll

17    begin there.

18        The base offense level in the case is determined

19    according to drug quantity.  In this case, drug quantity or

20    the converted drug weight is 71,378.5337 kilograms.  And that

21    does create a base offense level of 36.

22        There is a two-level increase because the defendant

23    possessed a firearm.  In this case, the Court finds that he

24    possessed multiple firearms, not only on his person but also

25    at the Russell Cave Road address.

1        There is a two-level increase because the defendant

2    maintained a premises for the purpose of distributing a

3    controlled substance.  And this would relate to the Bright

4    Avenue address.  That results in the adjusted offense level of

5    40.

6        There's a three-level reduction shown for acceptance of

7    responsibility.  What is the United States' position with

8    regard to the third level of acceptance credit?

9        MS. RIEKER:  As I stated a little while ago, Your

10    Honor, I have struggled with moving for that, but at this

11    time, I am going to move for the third level of the acceptance

12    of responsibility.

13        And I'm going to do that primarily because, as the Court

14    said, he has not challenged the authenticity of that drug

15    report.  He has not challenged anything else with respect to

16    that, other than the timing of that.  And so I certainly

17    understand how someone could not like that.  I mean, that does

18    change things tremendously.  But for this case and given the

19    guideline calculation as it stands now, I am going to go ahead

20    and move for that third level of acceptance.

21        THE COURT:  I'll sustain the motion and apply the

22    third level of acceptance credit.  That has the effect of

23    reducing the total offense level to a level 37.

24        The information regarding the defendant's criminal

25    history is contained in the presentence report in Part B.  He

1    has one criminal history point.  That would place him in

2    Criminal History Category I for purposes of calculating the

3    guideline range of incarceration.  Of course, the base offense

4    level will determine the fine range, the lower end of the fine

5    range.

6          And based upon a total offense level of 37 and Criminal

7    History Category I, the guideline range is 210 to 262 months

8    imprisonment.

9          The fine range in the case is a range of 40,000 on the

10   low end to $15 million on the high end.

11         The range for supervised release is also contained in the

12   presentence report, specifically paragraph 66.  Count 1, the

13   guideline range is five years.  The statute requires at least

14   five years.  For Count 2, the guideline range is four to five

15   years, and the statute would require at least four years for

16   that count.  As to Count 3, the statute requires at least two

17   years, and the guideline range is two to three years for that

18   count.

19         And those are the calculations that have been adopted in

20   this matter.

21         There are no counts to be dismissed, but let me see if

22   there are any other motions to be taken up in the case.

23         Ms. Rieker, any other motions by the government?

24             MS. RIEKER:  No, Your Honor.  Thank you.

25             THE COURT:  Mr. Gore?

1          MR. GORE:  No, Your Honor.  Thank you.

2          THE COURT:  If not, we'll proceed with allocution.

3      Mr. Gore, I'll hear from you at this time and also from

4      Mr. Ramos if he would like to address the Court.

5          MR. GORE:  Thank you, Judge.  Again, I do appreciate

6      you granting a continuance.  That gave me the opportunity to

7      look at the entire situation.

8      I think Ms. Rieker -- I do thank her for the third level

9      motion.

10     I do think it was just the realization hitting him that

11     his sentence is going to be much higher, and that's, as you

12     know and I can imagine, that would come as somewhat of a shock

13     when you see it actually happens.  We knew that was a

14     possibility, and there's no question about it.  But what

15     Ms. Rieker said is accurate.  There's no question about that,

16     Judge.

17     My client doesn't have much criminal history.  I think

18     he's got a possession and a controlled drug.

19     He does have a young child.  He loves his child.  He

20     knows he's going to prison for a long time.  He's going to

21     miss all that time with his child.  The child's going to be

22     out of high school by the time he gets out of prison.

23     So he knows he's going to get a stiff sentence.  He knows

24     why he has it.  And knowing the consequences, he did step up

25     and admit his guilt and plead guilty to these charges.

1     He's going to be on supervised release for quite some

2 time.  So that's going to afford -- in addition to a lengthy

3 prison sentence, that will afford protection to the public.

4     He does have a marijuana problem.  He would like to get

5 treatment while he's inside so he has asked me to ask the

6 Court to consider referring him to the 500-hour Bureau of

7 Prisons program.

8     He understands that he won't probably get any benefit for

9 taking that, but he would like to have -- the benefit he would

10 get from that would be the knowledge and the training he would

11 learn.  So he would like to have the opportunity to experience

12 that program.  He thinks it would be good for him.

13     He's going to be not an old person when he gets out.  At

14 my age, I don't really think of him as an old person.

15          THE COURT:  He's 28 now?

16          MR. GORE:  Yes, he is.  In terms of what he is now,

17 another half of his life --

18          THE COURT:  He could say that if he served a one-day

19 sentence, couldn't he?

20          MR. GORE:  You know, it's a long time.  And he's done

21 it to himself.  He's never made excuses when I talked to him.

22     Even facing the type of sentence he's facing, he has

23 always been very respectful to me, which I appreciate.  I

24 don't always get that.  He's been very pleasant.  His family

25 has been very supportive of him, very pleasant with me also.

1    So I think that says something about him.  When you're facing

2    20 or more years in prison, he's still treating the lawyer

3    with respect, I appreciate that.  And I do think that says

4    something about him as a person.

5    The charges in this case are very serious, and he

6    understands that.  You know, he jumped into the deep end of

7    the pool.  There's no question about that.

8    I would ask the Court to consider recommending him to

9    this drug program and consider recommending him to a facility

10    as close to Lexington that he would qualify for.

11    I think the supervised release for years is going to help

12    protect the public.  So I always ask the Court to take into

13    consideration he does have a child, he did plead guilty, he's

14    admitted what he did, and give him a sentence within the

15    guidelines but, you know, as low as the Court feels that the

16    Court can do.  He would appreciate that.  His family would

17    appreciate that.

18    And I believe he has a letter that he wrote you that he

19    would like to read.

20    THE COURT:  I do have one question for you before we

21    get to that, and it relates to the report that you attached to

22    your sentencing memo, 2004 report from the Sentencing

23    Commission on recidivism.

24    And you cited in your memo at page 5 on recidivism rates

25    indicate that they do decline with age, and that is true, but

1   you haven't cited the most recent data from the Sentencing

2   Commission that would indicate that those recidivism rates are

3   much higher than the 2004 report based on age.

4          MR. GORE:  That would be my fault.  In all candor, I

5   had some help on the research on some of that, and I apologize

6   if that's not the most recent one.

7          THE COURT:  While we're looking at age, a person in

8   this defendants's age at the time he's sentenced, recidivism

9   rates, if we only look at age, over 58 percent.

10      Now, if we look at time of release, his age, as we've

11  stated, he'll be -- just add 20 years to 28, so 48 when he's

12  released.  With good time credit, less than that.  Recidivism

13  rate is 42.4 percent and not 9.5 percent.

14         MR. GORE:  Judge, the thought is if you're under 21,

15  I think.  I understand.  No, I apologize.  That's the over 50.

16         THE COURT:  You cite the study, 2004 study, as

17  indicating recidivism rates decline relatively consistently as

18  age increases.  From 35.5 percent under age 21, if you just

19  want to compare apples to apples, most recent information is a

20  2016 report.  If we're looking at individuals younger than age

21  21 -- this is page 23 of a report captioned "Recidivism Among

22  Federal Offenders:  A Comprehensive Overview" -- instead of

23  35.5 percent, the number is 71.1 percent.  And you take 9.5

24  percent over age 50, and if we look at ages 41 to 50 at the

25  age of release, it's 42.4 percent.

1          Now, it drops as you get older than that, 51 to 60 years

2     of age.  But again, if you're using the defendant as a

3     hypothetical defendant, if he's 28 now, 20 years less whatever

4     good time credit he may get, he wouldn't be in the over age 50

5     group.

6          MR. GORE:  I understand.  It's just I think the

7     idea -- all I'll say is the idea is that the older you get,

8     there's not as much recidivism as he is at a younger age.  My

9     specifics are outdated, but I would just say it's the idea the

10    older you get, the less recidivism occurs.

11         THE COURT:  Yes, sir.

12         MR. GORE:  Typically.  I understand it's not

13    necessarily specific, but typically.

14         THE COURT:  Yes, sir.

15       All right.  Mr. Ramos, if you'd like to add anything to

16    what your attorney has said, you may do so at this time.

17         THE DEFENDANT:  I want to take this time to apologize

18    to the Court and my family for my actions.  I understand the

19    failure of my offense.  I take full responsibility for the

20    crimes I committed.  I have embarrassed myself and humiliated

21    my family.

22         THE COURT:  If you could read just a little bit

23    slower since the reporter's taking this down.

24         THE DEFENDANT:  I have embarrassed myself and

25    humiliated my family by engaging in illegal behavior.

1          This is my first time being in serious trouble, and I now

2     understand that my actions not only affect myself but everyone

3     around me as well.

4          I have a three-year-old son that needs a father.  I want

5     to be a part of his life and teach him to not make the same

6     mistakes as I made.

7          I have been battling drug addiction, and I hope to take

8     any drug programs offered to me.

9          I would also like to participate in educational and

10    career educational programs to give me the knowledge and

11    courage to help better myself and prevent me from making the

12    same mistakes.

13         I'm currently already on the list with the Bureau of

14    Prisons programs.

15         I recognize the harm that I have brought to society, and

16    I humbly ask the Court to forgive me.  Thank you.

17              THE COURT:  All right.  Thank you.

18         Ms. Rieker.

19              MS. RIEKER:  Thank you, Your Honor.

20         As the Court considers a sentence in this case, certainly

21    I agree that there's really no criminal -- much criminal

22    history here, documented criminal history.

23         However, with that said, the type of drugs that are

24    involved in this case and the amount of the drugs do not

25    indicate a first-time offender.  This is somebody who has been

at this business for a while.  So the fact that he doesn't

have a criminal conviction certainly is good, but I think the

conduct indicates that this has been an ongoing activity for

him.  You don't have this quantity of drugs as a first-time

offender generally or a first-time person involved in this.

And that is evident by the fact that he had a stash

house.  So he had a separate residence in which he was keeping

his drugs and his business.  He used a false name with which

to rent that particular residence.  And then he was -- he also

had a second residence where he also had things, and he'd go

back and forth between the two.

He clearly, it appears -- I would say it appears that he

has some type of source in the Georgia area, in the Atlanta

area.  And I say that because the officers believed that

because watching his vehicle and then coming back and

immediately having this type of drugs indicates that he had

just re-upped.  And so based on that, he certainly has a

source out of state, I would submit to the Court, and that is

significant.

The amount of the drugs in this case is very significant,

and the type of drugs is significant to the community.  They

are dangerous drugs.  People die from intaking these drugs.

These fentanyl pills are marked in such a way that they

don't look like fentanyl.  They're marked to be called Mexican

30s because they're represented often as Percocets.  So

1    someone taking a Percocet -- believing they're taking a

2    Percocet and, in fact, end up with a fentanyl pill could kill

3    someone.

4        And so based on that, Your Honor -- certainly I know the

5    Court knows.  You've been through this.  You've seen people

6    and you know this is a serious amount of drugs that were

7    involved here.

8        I would ask the Court to consider at least a sentence in

9    this case of 240 months.  And I say that because I certainly

10   attempted to give Mr. Ramos the benefit of not having the

11   second mandatory minimum ten-year sentence and did so and

12   honored my word on that.  However, given everything in this

13   case, I believe it is a significant sentence, and that is a

14   sentence that is within the guideline range which has been

15   properly calculated.

16       So as you consider a sentence in the case, Your Honor --

17   and I certainly believe it's the discretion of the Court.  You

18   may find that 262 months is appropriate, and I wouldn't

19   disagree with that.  I don't think 210 months is appropriate.

20       But to promote justice in this case, to protect the

21   community, to deter future conduct, I think it's important

22   that the Court does give him a significant sentence, given the

23   amount of drugs that was involved in this case and the

24   firearms and all of things that the Court would consider based

25   on the PSR.

1          THE COURT:   Thank you.

2          As I indicated earlier in this proceeding, of course, the

3     first step in determining an appropriate sentence is to

4     correctly calculate a guideline range.  And in a case such as

5     this, the guideline range is determined according to drug

6     quantity and criminal history.  So criminal history is

7     included in this calculation of a guideline range of 210 to

8     262 months.

9          The guideline range is high in part because of the drug

10    quantity and type of drugs involved.

11         The United States indicates these are very dangerous

12    drugs and do result in death and injury throughout the

13    district, throughout this district.  And one could conclude,

14    based upon the facts outlined in the presentence report, that

15    the defendant was not a rookie here.  He doesn't have a

16    significant criminal history.  He's got one criminal history

17    point.  But that is included in the calculation, his lack of

18    criminal history.

19         The defendant had a stash house at one location, and then

20    you had a residence at another location.  But the drug

21    trafficking activities were not just limited to the stash

22    house because he had significant amounts of drugs and also

23    firearms at what I would refer to as the residence address,

24    Russell Cave address.

25         And although it was not mentioned earlier when we were

discussing the objections, the defendant's live-in girlfriend has indicated that he had been seen with firearms at that location over the past year.  So he'd been seen at the location with firearms, and that's the location where pills and various other things, including methamphetamine, were located.

All that information is important.  It's not dispositive, but it is important because the Court does consider all relevant information in determining an appropriate sentence. And, of course, each sentence is individual.

So in this particular case, we do have two counts that would have mandatory minimum terms, Counts 1 and 2, the longest of which has been ten years; but the guideline range, based upon those drugs that were located in the defendant's two locations, would be much higher than those mandatory minimum terms.

When we look at the nature and circumstances of the offense, which I've just reviewed, of course they are quite serious.

The defendant's history and characteristics are certainly taken into account.  Unfortunately, many individuals that appear before the Court do have children, and I'm sure that they love their children and want to support their children, but their own actions prevent that.

And while the Court often considers family ties and

1    responsibilities under Chapter 5 of the guidelines, that would

2    not be a reason to depart here or vary here from the guideline

3    range.

4         Likewise, when we look at other factors of 3553,

5    including issues of deterrence, they would not support a

6    departure or a variance in this particular case.

7         Deterrence is twofold.  Deterrence is both a general

8    deterrence for others that might be inclined to commit a

9    similar offense as well as specific deterrence for this

10   defendant.  And based upon all the information provided to me,

11   I could not conclude that a sentence below 240 months would

12   provide either deterrence or would reflect the seriousness of

13   the offense or provide a just punishment.  So that is the

14   lower number that I would be looking at as we go through these

15   particular factors.

16        Of course, rehabilitation is an important factor as well,

17   and I will be recommending the defendant work toward

18   completing his GED, as well as that he participate in a job

19   skills and vocational training program.

20        I will recommend that he receive some drug treatment

21   during his period of incarceration.  I'm not sure that his

22   addiction would rise to the level of a recommendation for the

23   RDAP program, but the Bureau of Prisons can make that

24   appropriate determination as to the type of treatment program

25   that would benefit this defendant.

Likewise, I will point out for the parties' benefit that Section 601 of the First Step Act of 2018 does direct the Bureau of Prisons to place the defendant as close to his home. So I will call upon the Bureau of Prisons to meet its statutory obligation with regard to placement.

I also considered whether a fine would be appropriate in a case such as this under 5E1.2 because that section of the guidelines would indicate that the fine, together with any other penalties, should be sufficient to meet some of the factors of 3553. They were listed in subsection (d) of that guideline section.

In this particular case, I'm not going to impose a fine here. I believe that the term of incarceration as I will announce, which will be 240 months based upon all of these factors that I've reviewed, would be sufficient but not greater than necessary to meet all of those purposes.

I also considered other sentencing options, and I consider 3553(a)(6), the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. And with drug traffickers that have trafficked in the type of controlled substances involved here, that have the type of guideline range that is presented here, I have not hesitated to impose what I believe is an appropriate sentence in the middle or even at the top of the guideline range.

1         I certainly understand the United States' position with

2    regard to even a higher sentence, but the Court's obligation,

3    overarching obligation, is to impose a sentence that is

4    sufficient and not greater than necessary to meet all of those

5    factors that I've listed.  And I do find that 240 months would

6    be sufficient to accomplish those objectives and that purpose.

7         So I will announce the sentence at this time.

8         It it will be the sentence the Court, pursuant to the

9    Sentencing Reform Act of 1984, as modified by the decisions in

10   *Booker* and *Fanfan*, and I do believe the following sentence

11   would be sufficient but not greater than necessary to comply

12   with all of the purposes of Title 18, Section 3553(a).

13        And therefore, it will be the judgment of the Court that

14   the defendant, Guadalupe Ramos, Junior, will be committed to

15   the custody of the Bureau of Prisons for a term of 240 months

16   on each of Counts 1 and 2 and 60 months on Count 3.  All those

17   terms will be served concurrently to produce a total term of

18   240 months.

19        I will recommend that during the period of incarceration,

20   the defendant receive any necessary drug treatment that the

21   Bureau of Prisons determines to be appropriate, that he also

22   work toward completing his GED, and that he participate in any

23   job skills and vocational training programs for which he would

24   qualify.

25        Upon release, he'll be placed upon supervision for a term

of five years on each of Counts 1 and 2 and three years on

Count 3, for those terms to run concurrently to produce a

total term of supervision of five years.

Within 72 hours of release from the custody of the Bureau

of Prisons, Mr. Ramos must report in person to the Probation

Office in the district in which he is released.

While on supervised release, he may not commit another

federal, state, or local crime, he must comply with the

mandatory and the standard conditions adopted by the Court and

that will be set forth in the judgment and commitment order.

I'll also include the following special conditions:

Mr. Ramos may not purchase, possess, use, distribute, or

administer any controlled substance or paraphernalia relating

to controlled substances, except as prescribed by a physician.

He may not frequent places where controlled substances are

illegally sold, used, distributed, or administered.

He must submit his person, as well as any properties,

homes, residences, vehicles, storage units, papers, or

computers, as well as any other electronic communications or

data storage devices or media or any office to a search

conducted by the probation officer.  Failure to submit to a

search would be grounds for revocation of supervision.  And he

must warn all occupants that his premises would be subject to

a search according to this condition.

He must also refrain from obstructing or attempting to

obstruct or tamper in any fashion with the efficiency and
accuracy of any prohibited substance testing which is required
as a condition of release.

Now, as I indicated a moment ago, based upon my review of
the information in the presentence report, it's my
determination that this defendant does not have the ability to
pay a fine without imposing an undue hardship on his family;
and, therefore, the fine requirement will be waived.

You will, however, be required to pay the special
assessment of $100 per count of conviction for a total of
$300.  And that amount will be due immediately.

Also I'll note for the record once again that Section 601
of the First Step Act of 2019 does impose obligations for
placement upon the Bureau of Prisons.  And that is placement
nearest to his residence.  And so I will leave that to the
Bureau of Prisons to make that appropriate determination.

And that will be the sentence of the Court.

In reviewing the plea agreement, I do note the
defendant's waived the right to appeal the guilty plea and the
conviction, but he did not waive the right to appeal the
sentence.  And in just a moment, I will ask the clerk to
advise Mr. Ramos of that appellate right.

Before I do so, let me ask the parties to state at this
time any objections that they may have, first to the sentence
that has been announced.  And that would also include

1    conditions of supervision.

2          Second would be any objections under *United States v.*

3    *Bostic*.   Now, under that decision from the Sixth Circuit, any

4    objections not previously raised should be raised at this time

5    so that they may be addressed by the Court to be properly

6    preserved for review on appeal.

7          And then finally, if the parties would like the Court to

8    make additional findings to support the sentence that has been

9    announced, I'll certainly do so if requested.

10          Ms. Rieker, I'll begin with you.

11          MS. RIEKER:   Thank you, Your Honor.   We have no

12    objections to the sentence announced nor the conditions of

13    supervised release.   We have no *Bostic* objections, and we

14    require no further findings by the Court.

15          THE COURT:   All right.   Thank you.

16          Mr. Gore.

17          MR. GORE:   Thank you, Judge.   We have no objections

18    to the sentence.   We have no requirement of any *Bostic*

19    additional findings.   And we don't have any request for any

20    additional findings.

21          THE COURT:   All right.   Thank you.

22          Madam Clerk, if you would please advise Mr. Ramos of his

23    appellate rights with regard to the sentence.

24          (The form entitled Court's Advice of Right to

25           Appeal was read aloud in open court by the clerk.)

1          THE COURT:  Thank you.

2      Mr. Ramos, you're about to be handed what was just read.

3  You can take a moment and review your appellate rights with

4  counsel.  And after you've assured yourself that you

5  understand those rights, if you would please sign that

6  original document.  There's a copy that you can keep for your

7  records.

8      All right.  Thank you.

9      Let me see if there are any other issues to take up in

10  the case before we recess for the evening.

11          MS. RIEKER:  No issues, Your Honor.  Thank you.

12          THE COURT:  All right.  Mr. Gore?

13          MR. GORE:  No, thank you, Your Honor.  Appreciate it.

14  Again, thank you for the continuance.

15          THE COURT:  Yes, sir.  We will be in recess of the

16  court.

17      (Proceedings concluded at 4:52 p.m.)

18                              -  -  -

19                  C E R T I F I C A T E

20      I, JOAN LAMPKE AVERDICK, RMR-CRR, certify that the
    foregoing is a correct transcript from the record of
21  proceedings in the above-entitled case.

22  _\s\ Joan Lampke Averdick____      _December 31, 2020_____
    JOAN LAMPKE AVERDICK, RDR, CRR      Date of Certification
23  Official Court Reporter

24

25