UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

CRIMINAL ACTION NO. 5:20-CR-00013-DCR-EBA-1

(Related Civil Action No. 5:22-CV-00275-DCR-EBA)

UNITED STATES OF AMERICA,                                    PLAINTIFF,

V.                    **REPORT AND RECOMMENDATION**

GUADALUPE RAMOS,                                             DEFENDANT.

\*\*\* \*\*\* \*\*\* \*\*\*

On May 8, 2020, Guadalupe Ramos entered a plea of guilty to a three count indictment charging that he knowingly possessed with intent to distribute 500 grams or more of a mixture containing methamphetamine in violation of 21 U.S.C. § 841(a)(1); knowingly possessed with intent to distribute 40 grams or more of a mixture containing fentanyl, in violation of 21 U.S.C. § 841(a)(1); and knowingly possessed with intent to distribute a mixture containing marijuana in violation of 21 U.S.C. § 841(a)(1).  [R. 5].

Ramos' counsel received a copy of the Presentence Investigation Report ("PSR") on August 11, 2020.  [R. 29].  The report stated the following with regard to the substances seized from Ramos' residence:

> Forensic testing revealed the presence of the following controlled substances, along with their corresponding quantities: 700 grams of Tramadol (a Schedule IV narcotic); 854.981 grams of fentanyl; and, 112.2 grams of morphine. A portion of the 24.9837 kilograms of seized marijuana was submitted for confirmation testing. Analysis revealed . . . the substance to be marijuana. The defendant is also responsible for, as shown above, 3.839 kilograms of methamphetamine. *The seized methamphetamine has also been submitted for laboratory confirmation and purity analysis. The forensic report with respect to the methamphetamine remains pending, due to delays caused by the COVID-19 closures and restrictions.*

[R. 46 at pg. 6–7] (emphasis added).

Ramos' sentencing hearing was scheduled for August 21, 2020, but his counsel moved to continue, stating that he was in receipt of a copy of a new drug report disclosed by the government, indicating that the methamphetamine underlying Ramos' charges was 98% pure—which would impact the sentencing guidelines and potentially add years to Ramos' sentence. [*Id.* at pg. 1].

At a Docket Call on August 21, 2020. During the call, Ramos' attorney, Charles Gore, expressed concerns about the circumstances surrounding his receipt of the drug report, and moved to continue the sentencing. The Court granted the motion and scheduled Ramos to be sentenced on September 29, 2020. [R. 38]. At sentencing, the Court first took up Ramos' objection to the use of the drug purity report, which resulted in his criminal offense level increasing from 36 to 40 under the sentencing guidelines. [R. 54 at pg. 16].[1] Gore proffered that he had spoken with Ramos about potentially withdrawing the guilty plea and that Ramos explicitly told him not to file any motion to set aside his plea. [*Id.*].

Ultimately, the Court overruled Gore's objection to the use of the drug report to calculate Ramos' sentence, stating as follows:

> The question is not whether these test results are accurate. That's not been challenged. And likewise, the defendant has not established that the government has acted improperly in any way in providing these test results.
>
> As the United States has indicated, the test results were not received until after the defendant entered a plea, and e-mails that have been offered by the United States do establish that the actual methamphetamine test results do show that would result in a higher guideline range in the case, and that's what's happened here . . . .
>
> This Court does have an obligation to correctly calculate the guideline range based upon accurate drug quantity and accurate drug testing, which indicates the type of drug. We have that now, and the Court will not ignore those test results that were either known or should have been known to the defendant at the time that he entered his plea. So I will overrule the defendant's objections and discredit the application

---

[1] Absent the drug report results, there was no way to know whether the 3.839 kg of methamphetamine seized from Ramos' residence was a mixture containing methamphetamine; "actual" methamphetamine (at least 50% purity); or "ice," which is a "a mixture or substance containing d-methamphetamine hydrochloride of at least 80% purity." U.S.S.G. § 2D1.1(B)–(C).

of the statute guidelines.

[R. 54 at pg. 28–29].

The Court sentenced Ramos to a term of 240 months on Counts 1 and 2 and 60 months on Count 3 to be served concurrently, for a total of 240 months' imprisonment followed by five years of supervised release.  [*Id.* at pg. 44]; *see also* [R. 42].  Ramos appealed his sentence to the Sixth Circuit, and the Sixth Circuit affirmed the district court's judgment on December 1, 2021.  *United States v. Ramos*, No. 20-6158, 2021 U.S. App. LEXIS 35720 (6th Cir. Dec. 1, 2021).

Ramos filed the instant Motion to Vacate pursuant to 28 U.S.C. § 2255 on October 18, 2022.  [R. 60]. At base, almost all of Ramos' claims relate to the drug purity report produced to the defense after he pled guilty, and the effect the report had on his sentence.  The United States filed its Answer on January 10, 2023, arguing that all Ramos' claims are without merit, [R. 70], and tendered an affidavit from Ramos' trial counsel, Gore, who counters Ramos' assertions that he was ineffective at the pretrial and sentencing stages of Ramos' case.

## II. STANDARD OF REVIEW

A motion brought pursuant to 28 U.S.C. § 2255 is a collateral attack on a conviction. A prisoner has a statutory right to collaterally attack his conviction or sentence.  *Watson v. United States*, 165 F.3d 486, 488 (6th Cir. 1999).  For a federal prisoner to prevail on such a claim, he bears the burden of showing: (1) his conviction resulted from an error of constitutional magnitude; (2) his sentence was imposed outside the statutory limits; or (3) an error of fact or law occurred that was so fundamental as to render the entire proceedings invalid.  *Mallett v. United States*, 334 F.3d 491, 496–97 (6th Cir. 2003).  If the prisoner alleges constitutional error, he must establish by a preponderance of the evidence that the error "had a substantial and injurious effect or influence on the proceedings."  *Watson*, 165 F.3d at 488 (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993)).  Alternatively, if he alleges a non-constitutional error, he must establish "a

fundamental defect which inherently results in a complete miscarriage of justice . . . an error so egregious that it amounts to a violation of due process."  *Watson*, 165 F.3d at 488 (citing *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990)).

## III. ANALYSIS

### A. Plea Waiver

First, Ramos claims that his plea was not knowing or voluntary, and that his plea agreement, and waiver contained therein, is unenforceable.  "It is well settled that a defendant in a criminal case may waive any right, even a constitutional right, by means of a plea agreement." *United States v. Fleming*, 239 F.3d 761, 763–64 (6th Cir. 2001) (internal quotation marks omitted). The right to collaterally attack a sentence is one such waivable right. *Davila v. United* States, 258 F.3d 448, 450–51 (6th Cir. 2001). Where waiver provisions are clear and are intentionally and voluntarily included in the terms of a plea agreement, the waiver binds. *Fleming*, 239 F.3d at 763–64; *see United States v. Calderon*, 388 F.3d 197, 200 (6th Cir. 2004) (referencing *Fleming*, 239 F.3d at 764).

Here, and in relevant part, Ramos' plea agreement provides:

The Defendant waives the right to appeal the guilty plea and conviction. *Except for claims of ineffective assistance of counsel, the Defendant also waives the right to attack collaterally the guilty plea, conviction, and sentence.*

[R. 24 at pg. 4].

The terms of Ramos' waiver are plain and clear: he is proscribed from collaterally attacking his guilty plea, conviction, and sentence, *except* when raising claims of ineffective assistance of counsel.  [*Id.*].  At his rearraignment hearing, the United States reviewed the pertinent terms of the plea agreement—including the waiver provision—in open court to ensure Ramos understood and agreed to the terms. [R. 52 at pg. 9]. He did. [*Id.* at pg. 10–11]. Ultimately, the Court found Ramos "fully competent and capable of entering an informed plea" and that "his

plea of guilty is a knowingly and a voluntary plea which is supported by an independent basis in fact containing the essential elements of the offenses charged in the three counts contained in the indictment." [*Id.* at pg. 24].

Here, Ramos' Motion to Vacate and accompanying Memorandum of Law advances claims of prosecutorial misconduct, abuse of discretion by the Court, and ineffective assistance of counsel. As the plea agreement is valid and enforceable, the prosecutorial misconduct and abuse of discretion claims are barred from consideration pursuant to the waiver contained in the plea agreement. Thus, the Court shall only consider Ramos' ineffective assistance of counsel claims.

### B. Ineffective Assistance of Counsel

Construing Ramos' motion leniently, the Court identifies the following ineffective assistance of counsel claims:[2]

1. Counsel failed to conduct a sufficient pretrial investigation before advising him to plead guilty.
2. Counsel failed to seek suppression of evidence related to the GPS tracker on Ramos' vehicle, his traffic stop, and the searches of the Bright Avenue and Russel Cave Road residences.
3. Counsel failed to accurately estimate Defendant's federal sentencing guideline range.
4. Counsel failed to obtain a favorable plea offer.
5. Counsel failed to obtain the drug purity report before advising Ramos to plead guilty.
6. Counsel failed to withdraw Ramos' guilty plea.
7. Counsel failed to advise the Court that the drug purity test was at issue during Ramos' plea bargaining process and before Ramos pled guilty.

[R. 60 at pg. 4–5; R. 60-1 at pg. 1–2].

---

[2] Ramos' motion and accompanying Memorandum of Law articulates numerous claims of ineffective assistance which relate to different alleged actions or inactions by counsel at various stages of the proceeding. However, many of the claims' analyses significantly overlap with respect to relevant facts and applicable case law. This overlap justifies the Court handling some claims together, rather than separately. *See Stegawski v. United States*, No. 20-3067/3094/3095, 2020 U.S. App. LEXIS 42028, at *4 (6th Cir. Apr. 22, 2020) ("When possible, overlapping claims [in the § 2255 context] will be addressed together."). The Court shall indicate, when appropriate, which claims were consolidated for purposes of analysis under *Strickland*.

To successfully assert ineffective assistance of counsel, Ramos must show two essential elements for each claim: (1) deficient performance by counsel and (2) how "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984) (stating that "[u]nless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable").

First, regarding deficient performance, reviewing courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance." *Id.* To show representation fell below an objective standard of reasonableness, Ramos must articulate specific acts or omissions to show how counsel's performance fell "outside the wide range of professionally competent assistance." *Id.* at 690. Courts must make "every effort" to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Thus, Ramos bears the burden of showing that his counsel "made errors so serious that the counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

Second, Ramos must also establish prejudice by showing that there is a reasonable probability that, but for counsel's unprofessional errors, the result of his proceedings would have been different. *Id.* at 694–95. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 111–12 (2011) (citing *Strickland*, 466 U.S. at 696)). "When deciding ineffective-assistance claims, courts need not address both components of the [deficient performance and prejudice] inquiry 'if the defendant makes an insufficient showing on one.'" *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004); *Strickland*, 466 U.S. at 697. Further, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (quoting *Strickland*, 466 U.S. at 691).

"Counsel is constitutionally ineffective only if performance below the professional standards caused the defendant to lose what he otherwise would probably have won." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992).

### 1. Failure to conduct a sufficient pretrial investigation.

Ramos alleges that Gore failed to investigate his case twice in his petition. [R. 60-1 at pg. 1, 12]. Each allegation, however, is brief and wholly unsupported, broadly referring to an "investigation" without indicating what should have been discovered. Likewise, he fails to show how an investigation would have changed the outcome of his case. For instance, he does not allege that there was exculpatory evidence or other evidence that would have been discovered but for counsel's failure to investigate. Based on the record, there is nothing indicating that Gore's performance fell below any standard of professional competence with respect to a pretrial investigation. In the failure-to-investigate context, in addition to showing deficient performance, a defendant "must allege with specificity what the investigation would have revealed and how it would have altered the outcome." *United States v. Money*, No. 6:16-CR-00056-GFVT-EBA, 2021 U.S. Dist. LEXIS 54634, at *6 (E.D. Ky. Jan. 14, 2021) (quoting *United States v. Hassan*, 2014 U.S. Dist. LEXIS 150258, 2014 WL 5361942, at *5 (E.D. Mich. Oct. 21, 2014)). Moreover, "[m]ere speculation that an alternative strategy would have altered the judicial outcome is not sufficient." *Id.* at *6–7. "When 'assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.'" *Moore v. Brown*, No. 21-1514, 2022 U.S. App. LEXIS 23221, at *13–14 (6th Cir. Aug. 19, 2022) (quoting *Wiggins v. Smith*, 539 U.S. 510, 527, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003)).

Thus, because Ramos demonstrates neither deficient performance nor prejudice, Ramos' his claim of ineffective assistance fails.

**2. Failure to file motion to suppress or move for evidentiary hearing.**

Ramos asserts that counsel was ineffective because he failed to seek suppression of evidence obtained when:  (1) "[o]fficers place[d] a GPS tracker on [his] car without a search warrant or probable cause"; (2) "officers stopped [Ramos' car] with no probable cause"; and (3) the searches of the Russell Cave Road and Bright Avenue residences were conducted without probable cause. [R. 60-1 at pg. 2–3].  However, for reasons that follow, all of these arguments fail.

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Ray v. United States*, 721 F.3d 758, 762 (6th Cir. 2013) (quoting *Kimmelman*, 477 U.S. at 375 (1986)); *see also West*, 73 F.3d at 84 (quoting *Strickland*, 466 U.S. at 691) (holding that "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment").  Therefore, failure to file a motion to suppress may rise to the level of ineffective assistance.  *See Kimmelman v. Morrison*, 477 U.S. 365 (1986).  However, counsel's failure to file a meritorious motion to suppress "does not constitute *per se* ineffective assistance of counsel." *Id.* at 384.  "For such a failure to constitute deficient performance, the meritorious nature of the motion must be so plain that 'no competent attorney would think a motion to suppress would have failed.'" *Hendrix v. Palmer*, 893 F.3d 906, 922 (6th Cir. 2018) (quoting *Premo v. Moore*, 562 U.S. 115, 124 (2011)).  Thus, to show deficient performance, Ramos must demonstrate that counsel had "no reasonable strategic rationale for not filing the [suppression] motion." *Hendrix*, 893 F.3d at 911 (citing *Davis v. Lafler*, 658 F.3d 525,

537 (6th Cir. 2011) (en banc)).

     **a. GPS Tracker.** "[T]he Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search'" within the meaning of the Fourth Amendment. *United States v. Jones*, 565 U.S. 400, 404–05, 132 S. Ct. 945, 949 (2012). Thus, for the placement of a GPS tracking device on Ramos' vehicle to be constitutional, the government must have first obtained a warrant supported by probable cause. The United States did, in fact, seek and obtain such a warrant on November 25, 2019, which was renewed on January 8, 2020. [Appl. For Tracking Warrant, Nov. 25, 2019, 5:19-MJ-05354-MAS (E.D. Ky.)]; [Appl. For Ext. Use of Tracking Device, Jan. 8, 2020, 5:19-MJ-05354-MAS (E.D. Ky)]. Thus, to the extent Ramos argues that a GPS tracking device was placed on his vehicle without a warrant, such arguments are demonstrably false.

     To the extent that Ramos argues that the warrant was not supported by probable cause, these arguments, too, are unavailing. The initial application for a tracking warrant was supported by a fourteen-page affidavit offered by DEA Task Force Officer Timothy Graul, who extensively described his knowledge of the investigation of Ramos, beginning with information obtained by him and other DEA and ATF agents which suggested Ramos was engaged in criminal activity and possibly drug trafficking. [Appl. For Tracker Warrant, Aff. of Timothy Graul, 5:19-MJ-05354]. The information which he believed supported a finding of probable cause for placement of a GPS tracker on Ramos' car included details related to a controlled buy of suspected fentanyl by a confidential informant; physical and remote surveillance of the coming and going of Ramos' vehicle from the Russell Cave Road address to a Cathy Lane address, where the controlled buy occurred; and images of suspected drug paraphernalia captured on an audio/video recording device on the CI's person when the controlled buy took place. [*Id.*]. Based on this information, paired with his expertise and knowledge of drug trafficking activities, TFO Graul believed that Ramos

used the vehicle in furtherance of criminal activities. He averred that the use of a GPS tracking device would aid law enforcement in "ascertain[ing] Ramos' current involvement with drug trafficking by revealing the locations that [Ramos] frequents and the individuals Ramos meets with" without being detected. [*Id.* at pg. 12]. Based on the application and affidavit, and an ample showing of probable cause, Judge Stinnett authorized a Tracking Warrant for the placement of a tracking device on Ramos' car on November 25, 2019.

Judge Stinnett re-authorized the Tracking Warrant on January 8, 2020, relying again on an affidavit by TFO Graul. In addition to much of the same information regarding agents' physical and remote surveillance of Ramos' suspected criminal activities, TFO Graul also described new information received from a CI indicating that Ramos was transporting a large amount of heroin. Additionally, since the installation of the GPS tracking device, TFO Graul averred that Ramos drove the BMW sedan from Lexington, Kentucky to Atlanta, Georgia, which he knows to be a narcotics distribution hub. The BMW traveled around the Atlanta area and made numerous stops before returning to the Russell Cave Road residence on January 7, 2020. Relying on the information presented in the affidavit, Judge Stinnett renewed the Tracking Warrant on January 8, 2020.

In sum, the Tracker Warrant was supported by probable cause. For Ramos to prevail on an ineffective assistance claim, he must be able to demonstrate that no reasonably competent attorney would have failed to file a motion to suppress. In this instance, any motion to suppress, or motion for a suppression hearing, would have been meritless. Thus, Ramos does not successfully satisfy the first *Strickland* prong as to the GPS tracking device on his vehicle, and thus fails to prove that Gore was ineffective.

**b. January 9, 2020 Traffic Stop.** Next, Ramos avers that Gore was ineffective for failing to move to suppress the fruits of the January 9, 2020 traffic stop by Kentucky State Police or move

for a hearing related to the stop. In essence, Ramos alleges that officers stopped and searched his vehicle without probable cause.[3]  [R. 60-1 at pg. 2].  Assuming, without finding, that Gore was ineffective for failing to file a motion to suppress as it relates to the traffic stop or the subsequent search, Ramos is unable to prove that failure to file such a motion prejudiced him.[4]  The United States argues that, after Kentucky State Police executed a traffic stop, Ramos consented to a search of the vehicle.  [R. 70 at pg. 8–9].  That search yielded firearms and ammunition.  [R. 46 at pg. 5].  None of the crimes with which he was charged (and pled guilty to) relate to the firearms.  However, Ramos' sentence was subject to a two-level enhancement "for a firearm being possessed."  [R. 46 at pg. 18]; *see also* U.S.S.G. § 2D1.1(b)(1).  But, even if the fruits of the search of his car were suppressed, law enforcement also seized three firearms from the search of the Russell Cave Road address.  Because law enforcement also discovered firearms in Ramos' home, he would still be subject to a two-level enhancement even if the firearms seized from his car were suppressed.  Thus, it is unclear how a failure to suppress the fruits of the vehicle stop and search—the firearms and ammunition—prejudiced Ramos under *Strickland*.

In his motion, Ramos insinuates that the search of his car, and the arrest that followed, led to the search of his two residences: "Ramos explained to his attorney that his arrest warrant was never supposed to end in the search of a home where he was arrested on the side of the road."

---

[3] It is unclear whether Ramos is asserting that law enforcement stopped his car without probable cause, searched his car without probable cause, or both.  Construing his petition leniently, the undersigned shall consider whether the stop and the subsequent search are supported by probable cause.

[4] The undersigned shall proceed to the second *Strickland* prong as to this claim because the record is devoid of any mention of why Ramos was pulled over by Kentucky State Police on January 9, 2020.  The Court acknowledges that "[a]n ordinary traffic stop by a police officer is a 'seizure' within the meaning of the Fourth [and Fourteenth] Amendment[s]."  *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citing *Delaware v. Prouse*, 440 U.S. 648, 99 S. Ct. 1391, 1396, 59 L. Ed. 2d 660 (1979)).  Thus, officers may only lawfully "stop a car when [they] have probable cause to believe that a civil traffic violation has occurred[.]"  *United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012) (citing *Blair*, 524 F.3d at 748).

While KSP may have had probable cause to stop Ramos, the Court cannot make such a finding on the current record.  This is not dispositive on Ramos' ineffective assistance claim, however, because he must also prove that his attorney's failure to file a motion to suppress any fruits of the traffic stop must have prejudiced him within the meaning of *Strickland*.  Thus, the Court's analysis shall proceed to analyze whether Ramos suffered any prejudice.

[R. 60-1 at pg. 2]. Construing Ramos' claim leniently, he appears to argue that officers discovery of the firearms and ammunition in his car in some way supported law enforcement's search of the Bright Avenue and Russell Cave Road addresses. According to his logic, if the vehicle search was unconstitutional, the constitutionality of those searches is also in jeopardy.

Ramos' claims are unsupported by the record. First, and as discussed more fully below, the search of the Bright Avenue residence was conducted pursuant to a search warrant which was obtained *before* Ramos was ever pulled over by KSP; and, second, the search of the Russell Cave Road residence was conducted only after Ramos' girlfriend, Hernandez, gave agents consent to search the home. Based on the record, the traffic stop appears entirely independent of the other searches conducted by law enforcement, including the searches which yielded the large quantities of drugs which underpin Ramos' charges. Thus, any failure to file a motion to suppress, or move for a suppression hearing as to the traffic stop did not prejudice Ramos in any way. Thus, his claim fails under the second prong of the *Strickland* analysis.

**c. Russell Cave Road Search**. Next, Ramos claims that Gore was ineffective for failing to file a motion to suppress, or move for a suppression hearing, as to law enforcement's search of Ramos' residence at Russell Cave Road. Ramos states that he wanted his attorney to make such motions because law enforcement did not have a warrant to search either residence, including the Russell Cave Road address. [R. 60-1 at pg. 2]. However, the United States counters, and the record reflects, that federal agents searched the Russell Cave Road address only after obtaining the consent from Karen Hernandez, Ramos' girlfriend, who resided at the address with their two year-old child. [R. 70 at pg. 8–9]; *see also* [R. 10, Detention Hr'g] (defense counsel proffering to the Court that Ramos and Hernandez live together with their child).

While the Fourth Amendment normally prohibits the warrantless search of a home, *United States v. Haddix*, 239 F.3d 766, 767 (6th Cir. 2001), "[t]he prohibition does not apply . . . [when]

voluntary consent has been obtained, either from the individual whose property is searched . . . or from a third party who possesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990). The Sixth Circuit has held that a partner, such as a girlfriend, living with a defendant had the requisite common authority to authorize a search of a shared residence. *United States v. Moore*, 917 F.2d 215, 223 (6th Cir. 1990). The court has even extended such common authority to some closed containers in the shared residence. *United States v. Aaron*, 33 F. App'x 180, 184 (6th Cir. 2002) (holding girlfriend had authority to give consent to search password-protected computer).

Here, Ramos does not argue—nor does the record indicate—that Hernandez did not have the authority to consent to a search of the Russell Cave Road address. Ramos also does not argue, nor does the Court perceive, that Hernandez's consent to the search was involuntary or otherwise coerced by law enforcement. Thus, law enforcement did not need a warrant supported by probable cause to search the Russell Cave Road address. To make the threshold showing under *Strickland* that Gore's performance was deficient, Ramos must show that a suppression motion or hearing could have been meritorious. Absent any indica of a Fourth Amendment violation, no reasonably competent attorney would have moved to suppress the search, or for a hearing. Accordingly, Ramos' claim of ineffective of assistance of counsel as to the Russell Cave Road address fails under the first prong of *Strickland*.

**d. Bright Avenue Search.** Finally, Ramos claims that Gore was ineffective when he failed to file a motion to suppress, or move for a suppression hearing, as it relates to law enforcement's execution of a search of the Bright Avenue residence. Ramos' avers that "[federal agents] violated his rights by the trash pull where the warrant was not supported by probable cause and the warrant was misleading." [R. 60-1 at pg. 2–3]. Specifically, he claims that the warrant was only supported by the evidence recovered from the trash pull and, absent other evidence of his involvement in

drug-related activity, the trash pull alone could not have resulted in finding probable cause existed to search the residence.  [*Id.* at pg. 3] (citing *United States v. Abernathy*, 843 F.3d 243 (6th Cir. 2016)).

As a preliminary matter, the record clearly reflects that law enforcement searched the Bright Avenue residence pursuant to a search warrant issued by Judge Stinnett on January 9, 2020. Thus, any argument that law enforcement conducted a warrantless search is meritless.  However, the Court must assess whether the warrant issued was in fact supported by probable cause and, if it was not, whether a failure by Gore to challenge the search by way of a suppression motion rose to the level of ineffective assistance of counsel.

In assessing whether a warrant to search a residence passes muster under the Fourth Amendment, the "critical element . . . is . . . that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556, 98 S. Ct. 1970, 56 L. Ed. 2d 525 (1978). Accordingly, the supporting affidavit "must show a likelihood of two things: first, that the items sought are 'seizable by virtue of being connected with criminal activity'; and second, 'that the items will be found in the place to be searched.'"  *United States v. Church*, 823 F.3d 351, 355 (6th Cir. 2016) (quoting *Zurcher*, 436 U.S. at 555 n.6); *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009).  The first prong—the requirement that there is a nexus between the alleged criminal activity and the items to be seized—is satisfied when the object of the search is "contraband." *Church*, 823 F.3d at 355.  The second prong is satisfied if law enforcement shows that there is a "fair possibility" that the drugs will be found in a "particular place."  *Church*, 823 F.3d at 355 (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)). Importantly, "[t]he connection between the residence and the evidence of criminal activity must be specific and concrete, not 'vague' or 'generalized.'"  *United States v. Sanders*, No. 21-5945,

2023 U.S. App. LEXIS 2859, at *8 (6th Cir. Feb. 6, 2023).

The record shows that the warrant for Bright Avenue was plainly supported by probable cause. The search warrant relied upon an affidavit which offered far more than simply finding drug paraphernalia in a trash pull—the supporting affidavit described extensive physical and remote surveillance (including GPS tracking information) of Ramos as he traveled in his BMW to and from the Bright Avenue address. The affidavit also describes an instance on November 26, 2019 in which a CI called Ramos to arrange a controlled purchase of one pound of crystal methamphetamine while Ramos was inside the Bright Avenue address. Several hours later, Ramos departed Bright Avenue for an address on Cathy Lane, where the controlled buy ultimately took place. Investigators noted that Ramos arrived at Cathy Lane in the same BMW that they observed Ramos drive when traveling to the Bright Avenue address. Moreover, following the controlled buy at Cathy Lane, Ramos departed the address in his BMW and returned to the Bright Avenue address. The affidavit also provided that tracking data and surveillance of Ramos establishes that Ramos traveled to the Bright Avenue address on a near daily basis throughout December 2019.

According to the affidavit, in the hours preceding the trash pull conducted on January 9, 2020, officers observed Ramos exit the Bright Avenue residence and place trash bags in the receptacle outside. After placing the trash bag in the receptacle, officers observed Ramos return inside the Bright Avenue address. At the time the trash pull took place, the trash can was placed on the street in front of the residence, as pickup was scheduled for later that day. Agents retrieved two trash bags which contained a "cornucopia of evidence related to drug trafficking." [5:20-MJ-05007, R. 1 at pg. 12]. Inside the bag, officers observed three marijuana plants, Ziploc and cellophane packaging, and powder and bags with residue. Agents field tested a sample of the powders and tentatively identified some of the substances as baby powder "which can be utilized as either a cutting or masking agent." [*Id.* at pg. 13].

Based on the foregoing, and not solely the trash pull, Judge Stinnett authorized a search warrant for the Bright Avenue address on January 9, 2020. The warrant is plainly supported by probable cause when considering the analysis discussed above. First, the supporting affidavit sufficiently described that the object of the search was contraband—controlled substances—which law enforcement suspected Ramos was involved with trafficking. Thus, the warrant established a nexus between the place to be searched and the contraband law enforcement believed would be found. Second, the warrant was also valid because the supporting affidavit sufficiently demonstrated that there was a fair probability that contraband would be found on the premises by describing surveillance of the home, detailing controlled buys with a CI which occurred immediately after Ramos left the address, and by describing the items discovered in a trash pull performed in a trash receptacle outside the Bright Avenue address which contained a "cornucopia" of drug paraphernalia. *See United States v. Grant*, No. 21-3686, 2023 WL 119399, at *3 (6th Cir. Jan. 6, 2023) ("At a minimum, [the Sixth Circuit has] required 'facts showing that the residence had been used in drug trafficking, such as an informant who observed drug deals or drug paraphernalia in or around the residence.'"); *United States v. Abernathy*, 843 F.3d 243, 251-52 (6th Cir. 2016) (holding that drug paraphernalia recovered from a trash pull supported a finding of probable cause).

As the warrant was valid, the search did not violate Ramos' Fourth Amendment rights. Ramos has, therefore, failed to make a showing that a suppression motion as it relates to the search of the Bright Avenue address would have been meritorious. Thus, Ramos cannot demonstrate that Gore was ineffective for failing to make such a motion. Ramos' claim of ineffective assistance, therefore, fails on the first prong of *Strickland.*

**3. Failure to accurately estimate Ramos' federal sentencing guideline range.**

Next, Ramos asserts a claim of ineffective assistance counsel, claiming that Gore was

ineffective for his failure to accurately estimate the applicable sentencing guideline range. As a result, Ramos further claims that Gore failed to advise him of his sentencing exposure if he pled guilty plea or if he chose to go to trial. At several points throughout his motion, Ramos avers that Gore failed to advise him that he could have a base criminal offense level higher than 32, or that he could face a higher sentence if the drug purity report returned prior to sentencing; and that he had a right to know that his sentence could change based on the drugs' purity prior to pleading guilty. [R. 60-1 at pg. 5–6].

This claim fails. Even if Gore predicted an estimate of his sentence and that estimate was inaccurate, Ramos cannot prove the deficient performance because, in general, an attorney's inaccurate prediction regarding a possible sentence in a criminal case does not constitute deficient performance under *Strickland*. *Jones v. Holland*, No. 5:13-66-GFVT, 2013 U.S. Dist. LEXIS 189937, at *9 (E.D. Ky. Mar. 26, 2013) (citing *Salas v. United States*, No. 2:06-CR-18, 2012 U.S. Dist. LEXIS 130725 at *20–*21 (E.D. Tenn. Sept. 13, 2012)) (collecting cases). "A defendant's right to be apprised of the court's sentencing options is no greater than the provisions of Fed. R. Crim. P. 11[(b)(1)(H)–(I)], which requires only that the court inform the defendant of the applicable mandatory minimum and maximum sentences." *Jones*, No. 5:13-66-GFVT, 2013 U.S. Dist. LEXIS 189937, at *9.[5] For these reasons, Ramos has failed to prove deficient performance.

Moreover, Ramos' claim also fails on the prejudice prong. Irrespective of any advice rendered by Gore prior to rearraignment, the Court made Ramos aware that his Sentencing

---

[5] *Jones v. Holland* cites to an earlier iteration of Federal Rule of Criminal Procedure 11, wherein the provision discussing the Court's duty to inform a defendant of minimum and maximum penalties was contained in Fed. R. Crim. P. 11(c). No. 5:13-66-GFVT, 2013 U.S. Dist. LEXIS 189937, at *9 (E.D. Ky. Mar. 26, 2013). The provision was moved to, and expanded upon, in Fed. R. Crim. P. 11(b). The Advisory Committee's goal behind the change was "to expand upon the incomplete listing . . . of the elements of the 'maximum possible penalty' and any 'mandatory minimum' to include advice as to the maximum or minimum term of imprisonment, forfeiture, fine, and special assessment, in addition to the two types of maximum and minimum penalties presently enumerated: restitution and supervised release." Fed. R. Crim. P. 11, Advisory Comm. Note to 2002 Amend.

Guidelines range would be informed by several factors, which would be compiled in a PSR prepared by a probation officer *after* rearraignment and *before* sentencing. [R. 52 at pg. 13–14]. The Court explicitly asked Ramos: "[D]o you understand that until that process takes place, it would be impossible for the Court or for your attorney to know exactly what the guideline range would be?" [*Id.* at pg. 14]. Ramos answered in the affirmative. [*Id.*]. Importantly, he affirmed his understanding of how he would be sentenced under oath, and "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

"[A] misperception about the ultimate sentence is no basis for relief from a plea where the trial court complies with the notice requirements of Rule 11." *United States v. Lundy*, No. 6:08-CR-02-DCR, 2012 U.S. Dist. LEXIS 39553, at *24 (E.D. Ky. Feb. 27, 2012). Here, Chief Judge Reeves exhaustively conveyed the mandates of Rule 11 and explained that no one could predict a precise sentencing range at the rearraignment phase. As Ramos cannot demonstrate that any alleged deficient performance prejudiced him, this claim of ineffective assistance of counsel fails.

**4. Failure to obtain favorable plea offer.**

Ramos also claims that Gore was ineffective during the plea negotiation phase for his failure to obtain a "favorable" plea offer, and then advising him to plead guilty. Specifically, Ramos argues that Gore and the United States "worked together" to develop a plea agreement, Gore "tricked" Ramos into pleading guilty according to that agreement, and that the plea offer was facially deficient because "NOT ONE charge was dropped." [R. 60-1 at pg. 4, 12–13].

Defendants are entitled to effective assistance of counsel at all stages of a criminal proceeding, including pretrial plea negotiation. *Byrd v. Skipper*, 940 F.3d 248, 255 (6th Cir. 2019) (citing *Padilla v. Kentucky*, 559 U.S. 356, 373, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010) ("[W]e have long recognized that the negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel.")). However, "there is

no constitutional right to the prosecutor's maintenance of a plea offer or a judge's acceptance of a plea offer." *Id.* at 256. Thus, in this context, "[a] defendant challenging his attorney's conduct during plea bargaining . . . 'must show that counsel did not attempt to learn the facts of the case and failed to make a good-faith estimate of a likely sentence. He must also show that his lawyer's deficiency was a decisive factor in his decision to plead guilty.'" *Pough v. United States*, 442 F.3d 959, 966 (6th Cir. 2006) (quoting *United States v. Cieslowski*, 410 F.3d 353, 358-59 (7th Cir. 2005)).

Initially, the Court notes that Ramos' claim of ineffective assistance is internally inconsistent. On one hand, he claims that counsel was ineffective for failing to negotiate a plea; on the other hand, counsel was ineffective because he worked with the government to obtain a plea agreement. The record supports a finding that Gore's plea negotiations were to Ramos' benefit. Although no charges were dismissed, e-mail correspondence between Gore and Ms. Rieker shows that Gore inquired whether securing Ramos' guilty plea would result in the United States declining to pursue a superseding indictment. Based on the fact that no superseding indictment issued, it appears that Gore's negotiation was successful. On the record before the Court, there is simply no evidence that Gore's performance was constitutionally deficient. Thus, Ramos' claim fails under the first prong of *Strickland*.

**5. Failure to obtain drug purity report before advising Ramos to plead guilty.**

Next, Ramos claims that Gore was ineffective for failing to obtain a copy of the drug purity report before advising him to plea guilty. Specifically, Ramos argues that Gore should have filed a motion to compel the United States to produce the drug purity report. [R. 60-1 at pg. 4]. First, on the record, neither the defense nor the United States was in possession of the DEA drug purity report as to the methamphetamine at the time Ramos entered his guilty plea. This is evidenced by the PSR, which was produced months after Ramos' rearraignment, which indicated that the results

of the methamphetamine testing were still pending.  So, as to the ineffective assistance prong of *Strickland*, Ramos plainly fails to demonstrate that the motion would have been meritorious, as a party cannot be compelled to produce that which is not in their possession or control.  This goes for the drug purity report, which was produced by the DEA and only provided to the United States after Ramos pled guilty.

### 6. Failure to withdraw Ramos' guilty plea.

Ramos' next ineffective assistance of counsel claim avers that Gore failed to withdraw Ramos' guilty plea after obtaining a copy of the drug purity report.  He claims that, upon receiving the report and being put on notice that Ramos would receive a higher sentence, Gore "had a duty to withdraw" Ramos' plea, "regardless of what [Ramos] said."  [R. 60-1 at pg. 5].

"A defendant may withdraw a guilty plea after his plea is accepted by demonstrating that he has 'a fair and just reason for requesting the withdrawal.'"  *United States v. Luke*, No. 18-5270, 2018 U.S. App. LEXIS 30687, at *2 (6th Cir. Oct. 29, 2018) (quoting Fed. R. Crim. P. 11(d)(2)(B)).  Importantly, a defendant does not have an "absolute right" to withdraw a guilty plea."  *United States v. Fofana*, 50 F. App'x 725, 727 (6th Cir. 2002) (citing *United States v. Spencer*, 836 F.2d 236, 238 (6th Cir. 1987)).  But, regardless, defendants are generally entitled to assistance from counsel in withdrawing a guilty plea and failure by counsel to do so may "fall[] below the level of professional competence required in *Strickland*."  *United States v. Waucaush*, No. 99-1316, 2000 U.S. App. LEXIS 24874, at *16 (6th Cir. Sep. 27, 2000); *see e.g.*, *United States v. Nelson*, Nos. 03-CR-81123-DT, 05-CV-71546-DT, 2006 U.S. Dist. LEXIS 27278, at *10 (E.D. Mich. May 9, 2006) (commenting that "defense counsel's alleged failure to assist Defendant in filing a motion to withdraw his plea upon Defendant's request may possibly have fallen below the level of competence required in *Strickland*").

Here, the record clearly reflects that Gore consulted Ramos about withdrawing his guilty

plea, and Gore declined to do so. At the sentencing hearing, the Court and Gore had the following exchange:

> **THE COURT:** You entered into a nonbinding plea agreement with the United States in the case. The government produced evidence after this testing was performed, this methamphetamine testing, that had the effect of increasing the base offense level in the case based upon drug quantity. And this was all discussed at the last hearing we had. I believe it was in August?
>
> **GORE:** That's correct, Judge.
>
> **THE COURT:** And since that time, has there been any attempt to have this methamphetamine retested?
>
> **GORE:** No, Your Honor.
>
> **THE COURT:** Has there been any effort to seek to withdraw the guilty plea in the case?
>
> **GORE:** No. And for the record, I would like to advise the Court that he and I had that discussion, and I explained the process to him, and he told me not to file or set aside his guilty plea so I have not filed such motion. We did discuss it.
>
> **THE COURT:** All right. So you're acting in accordance with his instructions.
>
> **GORE:** Correct.

[R. 54 at pg. 18–19]. Later in the hearing, Ramos was offered the opportunity to "add anything to what [his] attorney said," and Ramos merely proceeded to his allocution. [*Id.* at pg. 36]. Ramos offers no evidence to contradict what is clear from the record: that Gore consulted with Ramos about whether he wanted Ramos to withdraw his guilty plea, and Ramos advised Gore that he did not wish to do so. Ramos also does not point to any authority that would suggest that Gore had a duty to move to withdraw the guilty plea *against* Ramos' wishes. There is a "strong presumption" that counsel's actions fell within the wide range of constitutionally adequate assistance, and a petitioner must "establish that no competent counsel would have taken the [challenged] action." *Khan v. United States*, 928 F.3d 1264, 1272 (11th Cir. 2019) (quoting *Chandler v. United States*, 218 F.3d 1305, 1314–15 (11th Cir. 2000) (en banc)). Thus, Ramos patently fails to demonstrate that Gore rendered ineffective assistance as to a failure to withdraw his guilty plea.

**7. Failure to advise the Court that drug purity report was at issue during plea bargaining or during rearraignment proceedings.**

Ramos also claims that Gore was ineffective prior to entry of the guilty plea due to his "fail[ure] to explain to the Court that [] purity was a[n] issue in the defendant's plea bargain process," and a report was pending.  [R. 60 at pg. 5].  However, Ramos offers no authority to support his claim that Gore should have advised the Court of the drug purity report "issue" during the rearraignment or prior to Ramos entering his guilty plea.  Had the Court been made aware that there was a drug purity report at issue, Ramos does not articulate how the result would have been different, or that he would have chosen to withdraw his plea.  Absent a demonstration of both constitutionally deficient performance by Gore, and prejudice to Ramos, this claim of ineffective assistance of counsel fails.

### C. Evidentiary Hearing

Ramos moves for an evidentiary hearing. In § 2255 proceedings, an evidentiary hearing is required unless "the record conclusively shows that the petitioner is entitled to no relief." *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999) (citing *Blanton v. United States*, 94 F.3d 227, 235 (6th Cir. 1996)).  For the reasons enumerated herein, the record conclusively shows that Ramos is not entitled to relief as to the claims he has asserted.  Accordingly, the undersigned recommends that Ramos' motion for an evidentiary hearing be denied.

### IV. CERTIFICATE OF APPEALABILITY

A Certificate of Appealability may issue where a movant made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires a movant to demonstrate that "reasonable jurists would find that the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (stating that issuance of a Certificate of Appealability in the context of a habeas petition filed under

28 U.S.C. § 2254, which legal reasoning applies with equal force to motions to vacate brought pursuant to 28 U.S.C. § 2255); *see also Miller-El v. Cockrell*, 123 S. Ct. 1029, 1039–40 (2003). The reviewing court must indicate which specific issues satisfy the "substantial showing" requirement. 28 U.S.C. § 2253(c)(3); *Bradley v. Birkett*, 156 F. App'x 771, 774 (6th Cir. 2005).

Here, Ramos has not made a "substantial showing" as to any claimed denial of his constitutional rights. Moreover, the Court is unconvinced that reasonable jurists would find its determination on the merits debatable. Therefore, this Court recommends that the District Court deny a Certificate of Appealability, should Ramos request one.

## V. CONCLUSION

Upon review of the record and for the reasons stated herein, and in accordance with Rule 10 of the Rules Governing Section 2255 Habeas Cases, **IT IS RECOMMENDED** that:

1. Ramos' Motion to Vacate Pursuant to 28 U.S.C. § 2255 be **DENIED,** and the matter be **DISMISSED**;

2. Ramos' motion for an Evidentiary Hearing be **DENIED**; and

3. A Certificate of Appealability be **DENIED** as to all issues raised, should Ramos so request.

\*\*\* \*\*\* \*\*\* \*\*\*

The parties are directed to 28 U.S.C. § 636(b)(1) for a review of appeal rights governing this Recommended Disposition. Particularized objections to this Recommended Disposition must be filed within fourteen days from the date of service thereof or further appeal is waived. *United States v. Campbell*, 261 F.3d 628, 632 (6th Cir. 2001); *Thomas v. Ann*, 728 F.2d 813, 815 (6th Cir. 1984). General objections or objections that require a judge's interpretation are insufficient to preserve the right to appeal. *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004); *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995). A party may file a response to another party's objections

within fourteen days after being served with a copy thereof. 28 U.S.C. § 636(b)(1)(C); FED. R. CRIM. P. 59(b)(1).

Signed February 15, 2023.



Signed By:

*Edward B. Atkins*

United States Magistrate Judge