UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Criminal Action No. 5: 20-013-DCR |
| Plaintiff/Respondent, | ) | and |
| | ) | Civil Action No. 5: 22-275-DCR |
| V. | ) | |
| | ) | |
| GUADALUPE RAMOS, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant/Movant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendant Guadalupe Ramos has filed a *pro se* motion, seeking to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. [Record No. 60] The motion was referred to Magistrate Judge Edward B. Atkins for issuance of a Report and Recommendation ("R&R") pursuant to 28 U.S.C. § 636(b)(1)(B). Magistrate Judge Atkins issued his report on February 15, 2023, recommending that Ramos' motion be denied. [Record No. 75]

The Court considers *de novo* those portions of a magistrate judge's recommendation to which objections are made. 28 U.S.C. § 636(b)(1)(C). However, "[i]t does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings." *Thomas v. Arn*, 474 U.S. 140, 150 (1985). The parties in this proceeding did not submit any objections to the Magistrate Judge's R&R.[1]

---

[1] Ramos filed a fourth motion requesting to submit a reply to the government's response to his § 2255 motion. [Record No. 78] For reasons stated previously, the Court will deny his request to file a reply brief. [*See* Record Nos. 72, 74, 77 (noting that a defendant is not entitled to file a reply brief under the Rules Governing Section 2255 Proceedings).] However, the Court liberally construes the substantive arguments in Ramos' motion to file a reply brief as

Upon review, the Court agrees with Magistrate Judge Atkins' determination that Ramos has not established that his attorney provided constitutionally ineffective assistance.  As a result, his motion will be denied.

## I.  Background

In November 2019, agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and Drug Enforcement Administration ("DEA") identified Ramos as an individual involved with a drug trafficking organization in the Lexington, Kentucky area.  To continue monitoring Ramos, DEA agents sought court authorization to install a GPS tracking device on the defendant's car.  [*See* Appl. For Tracking Warrant, Case No. 5: 19-MJ-05354.] DEA Task Force Officer Timothy Graul ("TFO Graul") indicated in a supporting affidavit that a confidential informant identified Ramos as a person who had distributed methamphetamine. [*Id.* at pp. 3-4] TFO Graul further confirmed that Ramos resided at 1040 Russell Cave Road, Lexington, Kentucky (the "Russell Cave Road" residence).  [*Id.*]  United States Magistrate Judge Matthew Stinnett authorized a tracking warrant on November 25, 2019, based on the information provided in the warrant application.  [*See id.* at pp. 20-21.]

DEA Agents applied to extend the tracking device on Ramos' car in January 2020. [Appl. For Extension, Case No. 5: 19-MJ-05354] TFO Graul stated that agents witnessed a black BMW sedan that the defendant had been driving travel to an apartment at 527 Bright Avenue ("Bright Avenue") almost daily.  [*Id.* at p. 15]  Agents monitored the black BMW as the vehicle departed Lexington, Kentucky, and traveled to Atlanta, Georgia, a known

---

objections to the Magistrate Judge's R&R.  The defendant's substantive objections are addressed below.

"distribution hub of large quantities of narcotics." [*Id.*] Magistrate Judge Stinnett renewed the tracking warrant on January 8, 2020. [*Id.* at pp. 23-24]

On January 8, 2020, DEA agents witnessed an individual resembling Ramos travel from the Russell Cave Road residence to the apartment at Bright Avenue where he stayed for approximately three hours. [Record No. 1-1, pp. 3-4] Agents observed the individual place two bags in a trash receptacle outside the apartment before leaving. [*Id.*] Agents inspected the trash outside the Bright Avenue apartment the following day and found evidence related to drug trafficking, including latex gloves, marijuana plants, Ziploc bags and cellophane packaging, and assorted powders and bags with residue. [*Id.* at p. 4]

Later on January 9, 2020, Kentucky State Police officers conducted a traffic stop on the black BMW Sedan driven by Ramos. [*Id.*] Officers seized two firearms and ammunition from the vehicle. [Record No. 46, p. 5] Agents also searched the Russell Cave Road residence based on consent obtained from the defendant's girlfriend, Karen Hernandez. [*Id.* at p. 4] There, they seized multiple firearms, ammunition, large quantities of suspected marijuana, pharmaceutical pills, and methamphetamine. [*Id.* at pp. 4-5]

Also on January 9, 2020, Magistrate Judge Stinnett authorized the search of the Bright Avenue apartment. [Appl. For Warrant, Case No. 5: 20-MJ-5007] Upon executing this warrant, DEA agents discovered approximately 3.62 kilograms of suspected methamphetamine, over 50 pounds of suspected marijuana, prescription pills, powders, a digital scale, a packaging press, and several cell phones. [*Id.* at p. 5]

Ramos was later indicted on three counts of possessing with the intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1). [Record No. 5] Attorney Charles Gore appeared as retained counsel for the defendant. [Record No. 4] On May 8, 2020, Ramos

pleaded guilty to all three counts included in the indictment.  [Record Nos. 20, 24, 25]  His plea agreement specified that the statutory minimum sentence of imprisonment for Count 1 was ten years.  He was also subject to a fine of not more than $10,000,000 and a term of supervised release of at least five years.  [Record No. 24]  The written agreement further provided that, under § 2D1.1(c)(4) of the United States Sentencing Guidelines, the base offense level for the defendant's conduct was "at least 32 because the converted drug weight is at least 3,000 KG but less than 10,000 KG."  [*Id.* at p. 4]

During the change-of-plea hearing, Ramos affirmed that he had sufficiently reviewed the indictment and plea agreement with Gore and that he was satisfied with the representation he had received from his attorney.  [Record No. 52, pp. 6-7]  Ramos also confirmed that he understood the terms of his plea agreement and supplement.  [*Id.* at p. 7]

After the United States summarized the essential terms of the parties' agreement, Ramos stated that the government's summary was accurate.  He further confirmed that he had not signed the documents or agreed to plead guilty because of any threats or coercion.  [*Id.* at pp. 7-11]  Following this exchange, the Court reviewed the statutory penalties and relevant provisions of the Sentencing Guidelines.  [*Id.* at pp. 11-15]  The defendant affirmed that he understood that the guideline recommendations outlined in the plea agreement were just that: recommendations and not binding on the Court.  [*Id.* at pp. 14-15]

The defendant's Presentence Investigation Report ("PSR") that was prepared subsequent to Ramos' guilty plea contained the following information regarding the controlled substances seized from the Bright Avenue residence:

> Forensic testing revealed the presence of the following controlled substances, along with their corresponding quantities: 700 grams of Tramadol . . . ; 854.981 grams of fentanyl; and, 112.2 grams of morphine.  A portion of the 24.9837 kilograms of seized

- 4 -

marijuana was submitted for confirmation testing. Analysis revealed confirmed the substance to be marijuana. The defendant is also responsible for, as shown above, 3.839 kilograms of methamphetamine. The seized methamphetamine has also been submitted for laboratory confirmation and purity analysis. The forensic report with respect to the methamphetamine remains pending, due to delays caused by the COVID-19 closures and restrictions.

[Record No. 46, pp. 6-7]

Attorney Gore moved to continue the defendant's sentencing hearing on August 19, 2020. He requested additional time to review the drug purity report ("the drug report")[2] which was provided two days before the hearing. [Record No. 34] Gore expressed concern that he did not receive the drug report prior to the defendant's change-of-plea hearing, in part, because it indicated that the drugs has been analyzed in March 2020 (or two months before the defendant pleaded guilty). [Record No. 53, pp. 2-3] Counsel argued that the defendant should have received this information prior to his plea hearing because it would "obviously change the guideline calculations" and would "make a difference on whether [the defendant] decide[d] to plead guilty or whether [he] decide[d] to go to trial." [*Id.* at p. 4]

The assistant United States Attorney responded that the government timely forwarded the drug report to Gore after receiving it from the DEA lab, noting that the DEA had experienced delays in testing controlled substances due to the COVID-19 pandemic. [*Id.*] However, the United States did not object to the motion to continue to allow Ramos additional time to review the results of the drug report with his attorney. [*Id.* at p. 5]

The assistant United States Attorney noted that, in conversations with Gore, there was "no question in our calculations . . . that should this methamphetamine turn out to be pure in

---

[2] The drug report indicated that the suspected methamphetamine seized from the Bright Avenue residence was 98 percent pure and thus constituted "actual methamphetamine." [*Id.*]

some form, that that was going to change the base offense level." [*Id.* at p. 6]  Moreover, counsel for the government noted that the delayed disclosure of the drug report benefitted the defendant.  As counsel explained, "had the drug report come back prior to sentencing, it would have triggered another mandatory minimum charge." [*Id.*]  The Court granted the defendant's motion to continue and provided an additional month to prepare for the sentencing hearing. [*Id.* at p. 10]

Counsel for the defendant objected to use of the drug report during Ramos' sentencing hearing but did not seek to withdraw the defendant's guilty plea.  [Record No. 54, p. 16]  Gore explained that the defendant asked counsel to object because Ramos received the drug report "shortly before sentencing," and because the information in the report resulted in an increase in his base offense level from 36 to 40.  [*Id.* at p. 16]  Gore noted that, while he discussed the possibility of withdrawing the defendant's guilty plea with Ramos, the defendant expressly told him "not to file or set aside his guilty plea." [*Id.* at p. 19] And Gore further stated that the defendant did not seek to challenge the accuracy of the drug report's results.  [*Id.*]

The attorney for the government reiterated that the language in the defendant's plea agreement contemplated the possibility that, "if the drug quantity of methamphetamine came back as actual methamphetamine, that . . . would change the converted drug weight to 79,829.79 kilograms and [Ramos] would have a base offense level of 36." [*Id.* at p. 23]  The undersigned overruled the defendant's objection to the use of the drug report.  [*Id.* at p. 28]  The Court explained that it would not "ignore [the drug report's] test results that were either known or should have been known to the defendant at the time that he entered his plea." [*Id.* at pp. 28-29]

The Court further found that the drug report's converted drug weight of 71,378.5337 kilograms yielded a base offense level of 36.  [*Id.* at p. 29]  It then applied a two-level increase under U.S.S.G. § 2D1.1(b)(1) because the defendant possessed a firearm during commission of the crimes charged, and a two-level increase pursuant to U.S.S.G. § 2D1.1(b)(12) because the defendant maintained a premises for the purpose of distributing controlled substances.  [*Id.* at pp. 29-30]  Ramos received a three-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a).  [*Id.* at p. 30]  The defendant's total offense level of 37 and Criminal History category of I yielded a guidelines range of 210 to 262 months imprisonment.  [*Id.* at p. 31]  The Court ultimately sentenced Ramos to 240 months' imprisonment on Counts 1 and 2 and 60 months on Count 3, to be served concurrently, followed by five years of supervised release.  [Record No. 42]

Ramos appealed his sentence to the United States Court of Appeals for the Sixth Circuit, challenging the Court's application of a two-level increase for possession of a firearm. He also contested a special condition of supervised release imposed by the Court.  *United States v. Ramos*, No. 20-6158, 2021 U.S. App. LEXIS 35720 (6th Cir. Dec. 1, 2021).  The Sixth Circuit, however, affirmed the judgment.  *Id.* at *11.

Ramos filed his § 2255 motion on October 18, 2022.  [Record No. 60]  He asserts seven claims, alleging that his trial attorney provided ineffective assistance under the Sixth Amendment to the Constitution.  [*Id.*]  His claims center on counsel's alleged failures to adequately investigate his case and to properly advise him regarding the drug report and its effect on his sentence.  [*Id.* at pp. 1-7]  Ramos also alleges that the attorney for the United States engaged in prosecutorial misconduct by failing to timely disclose the drug report, and

that the Court abused its discretion by accepting his plea "without advising [him] of a [potential] sentence enhancement" due to the drug report's results. [*Id.* at p. 7]

In response to the defendant's motion, the United States explains that the defendant is not entitled to relief because Ramos cannot show that Gore acted unreasonably. Specifically, it notes that Ramos' claims that Gore should have filed motions to suppress evidence lack merit, as the defendant has not presented a viable theory that any law enforcement officer's actions were constitutionally unsound. [Record No. 70, pp. 3-9] It further claims that Ramos cannot contend that Gore was ineffective for failing to timely obtain the drug report or for failing to seek to withdraw the defendant's plea agreement after receiving the drug report. [*Id.* at p. 12] It states that "counsel made the best objection he could [to the drug report] and the fact that the objection was not successful does not render counsel's performance deficient or prejudicial." [*Id.*]

The United States has submitted an affidavit from Gore which details his efforts in defending Ramos' case. [Record No. 70-1] In relevant part, Gore states that he did not file a motion to challenge the searches of the Russell Cave Road residence or the Bright Avenue apartment because the defendant never asked him to do so and, more importantly, any such motion would have been unsuccessful. [*Id.* at p. 1] Gore states that he initially believed Ramos' statements when the defendant told him that the suspected methamphetamine "was not pure meth." [*Id.*] However, counsel told Ramos that, "if the drug report came back as pure meth[,] then his guideline calculations would be significantly increased." [*Id.*] Gore reported that Ramos never asked him to seek an independent purity test on the drugs, file a motion to compel production of the drug test prior to his plea hearing, or file a motion to withdraw the guilty plea after receiving the drug report. [*Id.* at p. 2] Gore further explains that

he "kept the defendant advised throughout [his] representation" of the consequences of pleading guilty and of going to trial, and that the defendant's plea was voluntary. [*Id.*]

Magistrate Judge Atkins recommends denying all of Ramos' claims. [Record No. 75] He explains that the defendant's assertion his counsel failed to investigate the case should be denied because Ramos did not point to any evidence that Gore failed to discover. [*Id.* at p. 7] Additionally, Gore was not ineffective for failing to file motions to suppress because the defendant has not shown that any law enforcement officer's actions were improper. [*Id.* at pp. 8-16] Next, the Magistrate Judge recommends denying Ramos' claims involving counsel's actions regarding his guilty plea, because the defendant was properly informed by both counsel and the Court regarding the essential terms of his plea agreement and the consequences of pleading guilty. [*Id.* at pp. 17-21] The Magistrate Judge explains that Ramos cannot plausibly assert that his plea was somehow invalidated by his delayed receipt of the drug report because the report was produced "months after Ramos' rearraignment" and because the defendant was made aware of the effect the drug analysis could have on his sentence. [*Id.* at pp. 19-20]

## II.  Legal Standard

A federal prisoner may move a court that sentenced him to "vacate, set aside or correct the sentence" upon showing that the sentence is unlawful, that the court lacked jurisdiction, that the sentence is "in excess of the maximum authorized by law," or that the sentence is "otherwise subject to collateral attack."  28 U.S.C. § 2255.  "A motion brought under § 2255 must allege one of three bases as a threshold standard: (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid."  *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001).  Relief under § 2255 is warranted only when a petitioner shows a

fundamental defect which inherently results in a complete miscarriage of justice. *Miller v. United States*, 562 F. App'x 485, 490 (6th Cir. 2014) (citing *Davis v. United States*, 417 U.S. 333, 346 (1974)).

### III.  Analysis

Ramos' contention that the United States engaged in prosecutorial misconduct and that the Court abused its discretion at his plea hearing will be denied as waived by the terms of his plea agreement.  The plea agreement states that the defendant "waives the right to appeal the guilty plea and conviction. Except for claims of ineffective assistance of counsel, the Defendant also waives the right to attack collaterally the guilty plea, conviction, and sentence." [Record No. 24, p. 4]  As discussed in more detail below, Ramos has not demonstrated that he did not enter into his plea agreement knowingly or voluntarily, or that the agreement is invalid for any other reason.  Thus, the terms of his plea agreement foreclose these initial claims.

### A.  Ineffective Assistance of Trial Counsel

Ramos makes seven assertions of ineffective assistance of his trial counsel.  *See* U.S. Const. amend. VI.  A defendant's right to counsel is violated when counsel's performance falls below an objective standard of reasonableness and the defendant is prejudiced by counsel's performance.  *Henness v. Bagley*, 766 F.3d 550, 554 (6th Cir. 2014) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

Under the first prong of *Strickland*, courts "take care to avoid 'second-guessing'" an attorney's discretion and "strongly presume" that counsel "made all significant decisions in the exercise of reasonable professional judgment."  *Lundgren v. Mitchell*, 440 F.3d 754, 759-60 (6th Cir. 2014); *see also Strickland*, 466 U.S. at 690.  To satisfy the second prong, a movant must demonstrate that counsel's deficient performance would have changed the outcome of

the proceeding, considering "the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695-96.  In other words, a defendant must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  A movant must establish his claim of ineffective assistance by a preponderance of the evidence.  *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006).

### 1. Failure to Conduct An Adequate Pretrial Investigation

Ramos argues that Gore was ineffective for failing to investigate his case.  [Record No. 60, pp. 1, 12]  He asserts that, due to counsel's incompetence during the pretrial phase of the case, he was prevented from filing motions to suppress evidence seized from Russell Cave Road, Bright Avenue, or from his vehicle.  [*Id.* at p. 12]  This claim fails under both *Strickland* prongs.

Ramos' conclusory allegations that Gore failed to investigate are insufficient to support his assertion that Gore's performance was objectively unreasonable.  "When assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527-28 (2003). The defendant bears the burden of showing "what evidence counsel should have pursued and how such evidence would have been material." *Hutchison v. Bell*, 303 F.3d 720, 748 (6th Cir. 2002).

Magistrate Judge Atkins correctly determined that Ramos has not identified any evidence that would have been uncovered if Gore had conducted a more thorough investigation.  [Record No. 75, p. 7]  As discussed more thoroughly below, Gore adequately

investigated all potential Fourth Amendment violations but ultimately decided that filing a motion to suppress would be unavailing.  [Record No. 70-1, pp. 1-2]

But even if Ramos had identified evidence that Gore failed to discover, he cannot show that such evidence would have affected the outcome of the case.  In short, Ramos has failed to identify any evidence that would require further investigation or demonstrate that Gore's failure to uncover such evidence resulted in prejudice to him.

### 2.  Failure to File a Motion to Suppress

Ramos next alleges that Gore was ineffective for failing to file motions to suppress evidence that he claims was seized in violation of the Fourth Amendment.  Specifically, he argues that Gore should have challenged the following actions taken by law enforcement:

(1)   placing a GPS tracker on Ramos' car without a search warrant;

(2)   stopping Ramos' car without probable cause;

(3)   searching the Russell Cave Road residence; and

(4)   searching the Bright Avenue apartment.

[Record No. 60-1, pp. 2-3, 7-12]

A defendant who contends that his attorney was ineffective for failing to litigate a Fourth Amendment claim must show that the claim "is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice."  *Ray v. United States*, 721 F.3d 758, 762 (6th Cir. 2013).  This claim fails because Ramos has not demonstrated that any law enforcement officer's actions were improper, or that the outcome of Ramos' case would have been different but for Gore's failure to file a motion to suppress.

- 12 -

### i.  The GPS Tracker

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend IV.  "[L]aw enforcement officers perform[] a search within the meaning of the Fourth Amendment when they affix[] a GPS tracker to [a] Defendant's vehicle."  *United States v. Lee*, No. 6:11-CR-65-ART-HAI, 2012 WL 1880636, at *3 (E.D. Ky. Mar. 22, 2012) (citing *United States v. Jones*, 132 S. Ct. 945, 949 (2012)).   Ramos argues that Gore should have filed a motion to suppress evidence seized from his car because law enforcement officers "placed a GPS tracker on [the defendant's] car without a search warrant or probable cause."  [Record No. 60-1, p. 2]

The defendant is correct to note that DEA agents were required to either obtain a warrant or establish that an exception to the warrant requirement applies.  *See United States v. Galaviz*, 645 F.3d 347, 354-55 (6th Cir. 2011) ("The Fourth Amendment imposes a *per se* requirement that police officers obtain a warrant prior to conducting a search.") (citation omitted); *Taylor v. City of Saginaw*, 922 F.3d 328, 334 (6th Cir. 2019) ("The government bears the burden of demonstrating an exception to the warrant requirement.") (citing *United States v. Jeffers*, 342 U.S. 48, 51 (1951)).

The use of the GPS tracker was constitutional here because DEA agents obtained a valid warrant prior to placing the tracker on Ramos' vehicle.  "Issuance of a search warrant must be supported by probable cause, which depends on whether, under the totality of the circumstances, there is a fair probability evidence of a crime will be found in a particular place."  *United States v. Faulkner*, 826 F.3d 1139, 1144 (8th Cir. 2016) (citation omitted).  In

this instance, Magistrate Judge Stinnett's decisions to authorize the warrant in November 2019, and to renew the warrant in January 2020, were supported by probable cause.

In *United States v. Coleman*, the Sixth Circuit upheld the issuance of a tracking warrant when the supporting affidavit alleged the following facts: "[a] confidential informant identified [the defendant] as a current drug supplier . . . [an agent] observed an individual matching [the defendant's] description drive to a co-defendant's house . . . stay only four minutes, and leave, activity that could be consistent with the driver engaging in illegal drug sales . . . [and the defendant] had two prior felony convictions for delivery/manufacture of controlled substance." 923 F.3d 450, 454 (6th Cir. 2019). It rejected the defendant's argument that the warrant lacked support, instead noting that "[c]ourts have upheld vehicle-tracking warrants based on much weaker factual allegations than these." *Id.* (citing *Faulkner*, 826 F.3d at 1145 (affidavit established that informant told police that defendant trafficked drugs between two cities, had two addresses, and drove two vehicles, "but where no one had directly observed either vehicle involved in suspected drug activity"); *United States v. McNeal*, 818 F.3d 141, 150 (4th Cir. 2016) (affidavit established that vehicle was registered to suspect's mother, was driven to banks that had been robbed, and officers had received tip that vehicle was used in bank robberies).

In support of the initial application for a tracking warrant in the instant case, TFO Graul stated that an informant had provided information regarding Ramos' involvement in a controlled buy of suspected fentanyl, that agents had witnessed the defendant's car driving from the Russell Cave Road residence to the place where the controlled buy occurred, and that agents had obtained images of drug paraphernalia that the informant captured at the location of the controlled buy. [*See* Appl. For Tracking Warrant, Case No. 5:19-MJ-05354, pp. 5, 9-

11.]  This information which connected Ramos' vehicle to a location with suspected drug activities is sufficient to suggest that investigating agents would find evidence of drug trafficking when monitoring the defendant's vehicle.

Similarly, the application to extend the tracking warrant in January 2020 was supported by probable cause.  TFO Graul averred that agents had monitored another controlled purchase involving the defendant and a confidential informant and that agents had tracked the defendant's vehicle traveling from Lexington, Kentucky to a known drug trafficking hub. [Appl. For Extension, Case No. 5: 19-MJ-05354, pp. 13-15]  The information provided by TFO Graul supported the Magistrate Judge's renewal of the tracking warrant.

Ramos' claim that the agents' request for an extension relied on "the same stale, misleading, unchanged information" is incorrect.  [Record No. 78, p. 3]  The affidavit attached to the extension application relied on an additional controlled purchase involving the defendant and extensive surveillance of the defendant's car, all of which occurred after the first application for a warrant was granted.  The tracking warrant was supported by probable cause and Gore's decision not to file a motion challenging its issuance or extension was not objectively unreasonable.

### ii.  The January 9, 2020, Traffic Stop

"An ordinary traffic stop is a 'seizure' within the meaning of the Fourth Amendment." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)).  An officer "legally may stop a car when he has probable cause to believe that a civil traffic violation has occurred."  *Id.* (citing *United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007)).  Ramos contends that Gore provided ineffective assistance by failing to file a motion to suppress evidence seized from his vehicle following a traffic stop on January

9, 2020.  [Record No. 60-1, p. 2]  He argues that the stop and subsequent search of his vehicle violated his Fourth Amendment rights, and that any fruits of the allegedly unlawful search and seizure should have been suppressed.

Magistrate Judge Atkins correctly noted that the record is devoid of any reason why officers initially stopped Ramos' vehicle on January 9, 2020.  [*See* Record No. 75, p. 11 n.4.][3] But even if the defendant's Fourth Amendment claim regarding the traffic stop had merit, Ramos cannot show prejudice.  The evidence seized from his vehicle did not affect the outcome of his case.

Ramos' PSR indicates that two firearms and ammunition were seized from his vehicle following the traffic stop.  [Record No. 46, p. 5]  However, officers seized three additional firearms and ammunition from the Russell Cave Road residence the same day.  [*Id.* at pp. 4-5] Thus, the two-level increase to Ramos' sentence under U.S.S.G. § 2D1.1(b)(1) could have been based on either the firearms seized from the defendant's car *or* the Russell Cave Road residence.  [*See id.* at p. 8]

Ramos also claims that Gore was ineffective for failing to suppress the evidence seized during the traffic stop because that evidence led officers to search the Russell Cave Road residence and the Bright Avenue apartment.  But those searches do not constitute "fruits" of

---

[3] The Court assumes without deciding that the police officers lacked sufficient cause to stop the car.  Additionally, the Court assumes that the defendant's subsequent consent to search the vehicle was not sufficiently removed from the taint of the allegedly illegal seizure to validate the search.  *See United States v. Richardson*, 949 F.2d 851, 858 (6th Cir. 1991) (noting that "[i]f consent is given after an illegal seizure, that prior illegality taints the consent to search" unless the consent "is given at a time that is sufficiently attenuated from an illegal [seizure]") (citation omitted).

the allegedly illegal search of the defendant's vehicle because they were conducted independently of the search of his car.

As the Sixth Circuit explained in *United States v. Howard*, evidence obtained as the result of an illegal search need not be excluded under the Fourth Amendment if it is "later obtained independently from activities untainted by the initial illegality." *See* 621 F.3d 433, 451 (quoting *Murray v. United States*, 487 U.S. 533, 537 (1988)). Stated differently, "if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury.'" *Id.* (citing *Nix v. Williams*, 467 U.S. 431, 447 (1984)).

Here, there is no evidence that the searches of either the Russell Cave Road residence or the Bright Avenue apartment occurred as a result of, or in response to, the search of Ramos' car. Instead, as the Magistrate Judge correctly noted, the Bright Avenue search was authorized by a search warrant obtained before Ramos was stopped. And while the Russell Cave Road search was not authorized by a previously obtained warrant, agents had identified that residence as a potential location for drug trafficking activities while conducting surveillance of the defendant prior to the traffic stop. [*See* Record No. 46, p. 4.] Thus, law enforcement would have searched both locations regardless of the evidence obtained from searching the defendant's vehicle.

### iii.  The Russell Cave Road Search

A "warrantless entry and search by law enforcement officers does not violate the Fourth Amendment's proscription of 'unreasonable searches and seizures' if the officers have obtained the consent of a third party who possesses common authority over the premises."

*Illinois v. Rodriguez*, 497 U.S. 177, 179 (1990). "Common authority is not to be implied from a mere property interest that a third party has in the property, but from 'mutual use . . . by persons generally having joint access or control for most purposes.'" *United States v. Gillis*, 358 F.3d 386, 390 (6th Cir. 2004) (citation omitted). The Sixth Circuit has recognized that a defendant's live-in girlfriend who jointly occupies the defendant's residence has common authority to consent to a search of the residence. *See United States v. Ables*, 280 F. App'x 513, 518 (6th Cir. 2008); *United States v. Moore*, 917 F.2d 215, 222-23 (6th Cir. 1990). Here, Ramos asserts that Gore should have moved to suppress evidence seized from the Russell Cave Road residence because agents searched his home without a warrant. [Record No. 60-1, p. 2]

But Hernandez was in a relationship with Ramos and lived at the Russell Cave Road residence at the time of the search. [*See* Record No. 46, p. 4.] She therefore had common authority over the premises and could validly consent to the agents' search, and Ramos has not provided any information challenging that conclusion. Because the agents' search of the Russell Cave Road residence was validly conducted under the consent exception to the warrant requirement, Gore did not err by failing to challenge the search.

### iv.  The Bright Avenue Search

To demonstrate probable cause authorizing a search warrant, "an affidavit must show a likelihood of two things: first, that the items sought are 'seizable by virtue of being connected with criminal activity'; and second, 'that the items will be found in the place to be searched.'" *United States v. Church*, 823 F.3d 351, 355 (6th Cir. 2016) (citing *Zurcher v. Stanford Daily*, 436 U.S. 547, 555 (1978)). Because "[t]he nexus between 'criminal activity' and the item to be seized is 'automatic[ ]' when the object of the search is 'contraband,'" police requesting a warrant to search for illegal drugs need only satisfy *Church*'s second prong. *Id.* (citing

*Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967)).   Under that second requirement, officers requesting a warrant must demonstrate "'a fair probability' that the drugs 'will be found in a particular place.'"  *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

Ramos also claims that Gore should have challenged the search of the Bright Avenue residence.  He contends that the warrant authorizing the search lacked sufficient support because the evidence recovered from the trash pull did not prove that evidence of drug trafficking would be found inside the residence. [Record No. 60-1, p. 3]  However, the warrant to search the Bright Avenue residence was sufficiently supported by probable cause.  The supporting affidavit stated that agents sought to find controlled substances, satisfying the first prong of *Church*.  [*See* Appl. For Warrant, Case No. 5: 20-MJ-5007.]   Additionally, the supporting affidavit alleged sufficient facts to demonstrate that evidence of drug trafficking would be found on the premises.

The defendant's argument that the warrant application relied solely on the evidence recovered from the trash pull is inaccurate.  In addition to the drug paraphernalia found in the trash pull, the application cited extensive surveillance of the defendant traveling to the residence, his agreement to arrange a purchase of methamphetamine over a phone call taken inside the residence, and his documented return to the residence after participating in the controlled buy.  [*Id.* at pp. 4-11]  Those allegations sufficiently support the claim that evidence of drug trafficking would likely be found inside the Bright Avenue residence.  Gore was not ineffective for failing to file a motion to suppress the evidence seized during that search because a challenge to this warrant would not have succeeded.

### 3.  The Failure to Provide A More Accurate Estimate of the Guidelines Range

Ramos also contends that Gore was ineffective for providing an inaccurate estimate of his potential sentence under the United States Sentencing Guidelines.  [Record No. 60-1, pp. 5-6]  He argues that he did not "knowingly" enter a guilty plea because his attorney "failed to advise [him] before [his] plea that he could be facing more time than the plea guideline range of a 32, Category I Criminal History Level."  [*Id.* at p. 6]

Courts are required to inform a defendant of the relevant mandatory minimum penalties provided by statute during the defendant's change-of-plea hearing.  *See* Fed. R. Crim. P. 11(c)(1); *see also United States v. Lundy*, No. 6: 08-CR-02-DCR, 2012 WL 928697, at *5 (E.D. Ky. Feb. 27, 2012) (finding that defendant was adequately informed of Court's sentencing options because defendant "unquestionably knew from both the Plea Agreement and [the Court] the potential maximum penalties in play").  Provided that the defendant is properly informed in accordance with Rule 11's requirements, "an attorney's inaccurate prediction about a possible sentence to be imposed in an ongoing criminal case does not satisfy the deficiency prong of *Strickland*."  *Jones v. Holland*, No. 5: 13-66-GFVT, 2013 WL 11079776, at * 3 (E.D. Ky. Mar. 26, 2013) (collecting cases); *see also United States v. Hicks*, 4 F.3d 1358, 1363 n.3 (6th Cir. 1993) ("It is well settled that a defense attorney's erroneous calculation and prediction of the sentencing guidelines is not a basis for setting aside a guilty plea.").

Ramos' claim that he was misinformed regarding his potential sentence fails under both prongs of *Strickland*.  The defendant has not offered any evidence, aside from his own allegations, to show that Gore misrepresented his estimated guidelines calculations prior to his entry of the defendant's guilty plea.  Notably, his claim that counsel promised that a certain

guidelines range would apply are contradicted by his sworn statements during his change-of-plea hearing that no promises were made regarding his potential sentence aside from those in the plea agreement.  [Record No. 52, p. 10]  Ramos' statements made under oath and before the Court strongly undermine his claim that counsel promised that he would receive a lesser sentence.

But even if Gore had suggested that Ramos' ultimate guidelines range would be lower, counsel's statements did not prejudice the defendant because Ramos was adequately informed of his potential sentence during his re-arraignment hearing.  The Court advised Ramos of the relevant statutory penalties and stressed that the parties could not know the defendant's actual guidelines range until they received the PSR and any objections were resolved by the Court. [Record No. 52, p. 14]  Again, it bears repeating that the Court noted that the recommendations in the parties' plea agreement regarding the potential guidelines range were "only recommendations and would not be binding . . ."  [*Id.*]  Ramos cannot show that he lacked required information about his potential sentence, given the Court's explanation.

Ramos has failed to demonstrate that he was inadequately informed of his potential guidelines range or potential sentence or that his attorney's actions regarding the plea agreement constituted prejudice.

### 4.  The Alleged Failure to Obtain a More Favorable Plea Offer

"[T]he failure to negotiate a different plea agreement may be characterized as trial strategy that does not constitute ineffective assistance of counsel."  *United States v. Jones*, No. 5: 10-cr-78-JMH-EBA, 2015 WL 2342867, at *8 (E.D. Ky. May 14, 2015).  To demonstrate that an attorney's conduct during plea negotiations was constitutionally ineffective, a defendant must show that "counsel did not attempt to learn the facts of the case and failed to

make a good-faith estimate of a likely sentence.  He must also show that his lawyer's deficiency was a decisive factor in his decision to plead guilty." *Pough v. United States*, 442 F.3d 959, 966 (6th Cir. 2006) (citation omitted).

Ramos also argues that Gore was ineffective by failing to obtain a more favorable plea offer.  [Record No. 60-1, pp. 4, 12-13]  And he contends that Gore coerced him into signing a plea agreement that negatively impacted his sentence because the agreement did not provide for the dismissal of any charges.  [*Id.* at p. 4] However, Ramos has not provided any information suggesting that Gore failed to learn the facts of his case or that Gore's actions were "anything other than sound trial strategy." *Jones*, 2015 WL 2342867, at *8.  In fact, as Magistrate Judge Atkins correctly noted, the record suggests that Gore negotiated an agreement that benefitted the defendant.

Counsel for both parties noted that, during their negotiations, Gore requested that the government abstain from presenting a superseding indictment against the defendant with enhanced drug quantities if Ramos pleaded guilty.  [Record No. 54, p. 23]  And the record shows that the defendant was not presented with a superseding indictment in exchange for his plea.  Accordingly, Ramos has not demonstrated that Gore acted unreasonably during plea negotiations.

Additionally, even if Gore's negotiations were ineffective, Ramos cannot show that counsel's efforts prejudiced him.  To show prejudice in the context of a failure to negotiate a more favorable plea agreement, a defendant must show that "the government would have negotiated a different plea agreement with him . . . [or that the defendant's] hypothetical, different plea agreement would be more favorable to him than the one negotiated by counsel."

*Jones*, 2015 WL 2342867, at *9.   Ramos has provided any evidence indicating that the government would have agreed to a more favorable plea agreement.

### 5. The Alleged Failure to Compel Production of the Drug Purity Report

Ramos argues that Gore was ineffective for failing to obtain a copy of the drug report prior to his plea hearing.  [Record No. 60-1, p. 4]  It is doubtful that Ramos could demonstrate that counsel was required to compel production of the drug report, particularly when the defendant never asked his attorney for it and neither party had access to the report prior to the defendant's re-arraignment.  [*See* Record No. 70-1, p. 2.]  Further, the record demonstrates that delay in production of the report was due to circumstances outside of the parties' control. [*See* Record No. 78, p. 8.]  The defendant's PSR indicates that the results of the drug report were not yet available "due to delays caused by the COVID-19 closures and restrictions." [Record No. 46, p. 7]  It is nonsensical to fault counsel for failing to compel production of a report that was not in existence or in the possession of the assistant United States Attorney.

Further, Ramos was not prejudiced by counsel's failure to compel production of the drug report because its delayed production did not harm the defendant.   Counsel correctly noted in his affidavit that the Court would have applied the same guidelines range regardless of when the parties received the drug report.  [Record No. 70-1, p. 2]  If anything, the defendant was benefitted by the delayed disclosure of the subject report because the United States did not file a superseding indictment charging the defendant with possessing the greater drug quantities listed in the report, as mentioned above.  [Record No. 54, p. 39]

Gore did not act unreasonably by failing to compel production of the report and because the delayed receipt of the drug report did not prejudice the defendant.

### 6. The Alleged Failure to Move to Withdraw the Defendant's Plea

Ramos asserts that Gore provided ineffective assistance by not moving to withdraw the defendant's guilty plea. [Record No. 60-1, p. 5] Ramos recognizes that he never asked counsel to file a motion to withdraw his plea, but nevertheless contends that Gore acted unreasonably because "[i]t was the attorney's job to withdraw the plea regardless of what the defendant said." [*Id.*]

First, the defendant has not established that Gore's actions were improper, unreasonable or contrary to Ramos' directions. In the context of seeking the withdrawal of a guilty plea, "[a] defendant receives ineffective assistance of counsel when his trial counsel 'fails to act on his request to withdraw his plea when the possibility that he would have been allowed to withdraw his plea is not insubstantial.'" *Perry v. Lazaroff*, No. 1:16-CV-225, 2016 WL 8674485, at *14 (N.D. Ohio Nov. 4, 2016) (citation omitted). Ramos cannot show Gore acted improperly in part because the defendant never asked counsel to take action to seek to withdraw his plea.

During the defendant's sentencing hearing, the Court asked Gore whether Ramos had expressed a desire to withdraw his guilty plea after receiving the drug report. Counsel indicated that, although he had discussed the possibility of withdrawing the plea with the defendant, Ramos told Gore not to seek such relief. [Record No. 54, p. 19] Later in this hearing, when Ramos was given the opportunity to counter his attorney's statements or provide additional information, he said nothing. [*Id.* at p. 36]

An attorney's failure to move to withdraw a defendant's plea does not constitute ineffective assistance when the defendant does not clearly make such a request. *See, e.g., United States v. Scott*, 664 F. App'x 232, 241-42 (3d Cir. 2016) (noting that attorney was not

ineffective for failing to move to withdraw guilty plea when defendant "had not communicated [a] clear desire to do so"). Additionally, Gore was not ineffective for failing to move to withdraw Ramos' guilty plea because the filing of such a motion would not have changed the outcome of Ramos' case.

Trial counsel is not ineffective for failing to file a motion to withdraw a defendant's guilty plea when a defendant "does not set forth a 'reasonable or legitimate basis for the withdrawal of his plea.'" *Perry*, 2016 WL 8674485, at *14 (citation omitted). Before granting such relief under Rule 11 of the Federal Rules of Criminal Procedure, a defendant must demonstrate a "fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B); *see also United States v. Bashara*, 27 F.3d 1174, 1181 (6th Cir. 1994), *abrogated on other grounds by United States v. Caseslorente*, 220 F.3d 727 (6th Cir. 2000) (noting that courts consider seven factors in determining whether to grant a defendant's motion to withdraw his guilty plea, including "the amount of time that elapsed between the plea and the motion to withdraw it . . . whether the defendant has asserted or maintained his innocence . . . [and] the circumstances underlying the entry of the guilty plea").

Ramos could not have succeeded with a move to withdraw his guilty plea because he could not have demonstrated that he entered his plea unknowingly. During the defendant's change-of-plea hearing, the Court thoroughly advised Ramos of the consequences of entering a guilty plea. Additionally, the Court expressly stated that the parties could not predict his sentence with any certainty until they received his PSR. [Record No. 52, p. 14] The Court's "change-of-plea colloquy . . . included all the elements needed to establish a voluntary and knowing plea," and Ramos has not provided any reliable evidence suggesting otherwise. *United States v. Powell*, 798 F.3d 431, 434 (6th Cir. 2015).

In addition to the foregoing reasons, after being placed under oath, Ramos admitted that he was guilty of the crimes charged in the indictment due to his conduct "selling drugs." [*Id.* at p. 21]  Ramos' "solemn declarations in open court" that he was guilty "carr[y] a strong presumption of verity" that he has failed to rebut.  *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977).  In light of the foregoing, an attempt to withdraw a guilty plea in response to the higher drug quantities in a final PSR would not constitute a "fair and just reason" for withdrawal under Rule 11.

### 7.   The Alleged Failure to Advise the Court of the Absence of the Drug Purity Report

Finally, Ramos claims that Gore was ineffective for failing to advise the Court that "purity was a[n] issue in the defendant's plea bargain process" prior to the change-of-plea hearing.  [Record No. 60, p. 5]  Magistrate Judge Atkins correctly concluded that Ramos failed to establish that Gore had a duty to inform the Court that the parties had not yet obtained the results of the drug report.  Counsel acted properly by moving to continue the defendant's sentencing hearing after receiving the drug report, and Ramos does not provide any authority suggesting that counsel should have responded differently.

Moreover, Ramos has not demonstrated that had the Court known about the delay in receiving the drug report, it would have postponed the defendant's change-of-plea hearing. The higher drug weight reflected in the drug report did not alter the relevant mandatory minimum penalties in the defendant's case.  And Ramos cannot claim that he was not aware of the potential impact of the drug report because his plea agreement contemplated an enhancement in case the drugs he possessed constituted "actual" methamphetamine.  [*See* Record No. 78, pp. 4-5.] While the drug report results did yield a higher guidelines range, the

plea agreement accounted for that potential enhancement.  It states that the defendant's base offense level is "at least 32 because the converted drug weight is at least 3,000 KG but less than 10,000 KG." [Record No. 24, p. 4]  The assistant United States attorney confirmed that the plea agreement utilized this language in the event the drug report confirmed that the defendant possessed actual methamphetamine.  [*See* Record No. 53, p. 6.]

The Court specifically asked the defendant whether he "possessed the amounts that are charged" in the indictment, including "500 grams or more of methamphetamine." [Record No. 52, p. 22]  And Ramos affirmed that he possessed the listed amounts.  [*Id.*]  The defendant understood the terms of his plea agreement, including the fact that it recognized the potential for enhanced penalties depending on the results of the drug report.  As such, Ramos' attorney was not required to further inform the Court that the parties were unsure of the exact amount of drugs attributable to him.

## IV.  Evidentiary Hearing

Ramos has requested an evidentiary hearing on the claims contained in his motion. [Record No. 60-1, p. 16]  Section 2255 provides that, "unless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto."  The Sixth Circuit has recognized that when a movant alleges facts that entitle him to relief, "a district court may only forego a hearing where 'the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.'"  *MacLloyd v. United States*, 684 F. App'x 555, 559 (6th Cir. 2017) (citation omitted).

Ramos is not entitled to an evidentiary hearing because the factual allegations in the defendant's motion are either insufficiently alleged or are contradicted by evidence in the record. The defendant's vague statements that Gore "inadequately prepared for trial" do not warrant an evidentiary hearing, as Ramos failed to identify any evidence that his attorney would have discovered if Gore had more thoroughly investigated the case.

And Ramos is not entitled to an evidentiary hearing on his claims that Gore was ineffective regarding the plea agreement because both parties' in-Court statements established that the agreement benefitted the defendant. Next, Ramos' claim that counsel failed to adequately inform him of his potential guidelines range or sentence is discredited by the defendant's statements during his change-of-plea hearing indicating that he adequately reviewed his plea agreement and understood its terms and conditions.

Moreover, the Court thoroughly informed the defendant during the change-of-plea hearing of the contents of his plea agreement, the consequences of his decision to plead guilty, and his prospective sentence under statute and United States Sentencing Guidelines. Specifically, Ramos predicted base offense level accounted for the potential impact that the drug report would have on his guidelines range. Having been duly informed, the defendant stated, under oath, that he was guilty of the crimes charged. His sworn declarations undermine his present claims that his attorney's failures or the delayed receipt of the drug report somehow rendered his plea invalid. Ramos has not provided any factual allegations warranting an evidentiary hearing in this matter.

## V.  Certificate of Appealability

The Court will issue or deny a certificate of appealability when it enters a final order that is adverse to the movant in a § 2255 proceeding. Rule 11 of the Rules Governing § 2255

Proceedings; 28 U.S.C. § 2253(c)(1)(B).  A certificate of appealability may be issued only when the defendant has "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  To satisfy this burden, a defendant must show that reasonable jurists could debate whether the petition should have been resolved in a different way or that the issues involved were "adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4) (1983)).

Here, reasonable jurists would not debate the Court's conclusions.  Gore effectively investigated Ramos' case, negotiated a plea agreement favorable to the defendant, and represented effectively during Ramos' change-of-plea and sentencing hearings.  Counsel did not act unreasonably by failing to file a motion to suppress evidence because any such motion would not have had any effect on the outcome of the defendant's case.  Finally, even if the Court assumes that counsel's actions at Ramos' change-of-plea hearing were improper, such conduct did not prejudice the defendant because the Court fully informed Ramos of the nature of his plea agreement and the consequences of pleading guilty.  Because the defendant's arguments are without merit based on evidence in the record, no certificate of appealability will issue.

### VI.  Conclusion

Ramos has failed to demonstrate that his attorney provided ineffective assistance under the standard set forth in *Strickland*.  Accordingly, is hereby

**ORDERED** as follows:

1.      The Magistrate Judge's Report and Recommendation [Record No. 75] is **ADOPTED** and **INCORPORATED** here by reference.   Defendant/Movant Guadalupe Ramos' objections to the Report and Recommendation are **OVERRULED**.

2.      Defendant/Movant Guadalupe Ramos' motion to vacate, correct, or set aside his sentence pursuant to 28 U.S.C. § 2255 [Record No. 60] is **DENIED**.   His claims are **DISMISSED**, with prejudice, and **STRICKEN** from the docket.

3.      A Certificate of Appealability will not issue.

4.      Defendant/Movant Ramos' motion for certificate of appealability/motion for evidentiary hearing [Record No. 78] is **DENIED**.

Dated: March 15, 2023.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky